[No. S116081. May 19, 2005.]

SIERRA CLUB et al., Plaintiffs and Appellants, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Respondent;
CATELLUS RESIDENTIAL GROUP, Real Party in Interest and
Respondent.

Counsel

Law Offices of Frank P. Angel, Frank P. Angel, Curtis M. Horton, Phyl van Ammers, Meredith Lobel-Angel and Edward Grutzmacher for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Richard M. Frank, Chief Assistant Attorney General, J. Matthew Rodriguez, Assistant Attorney General, Jamee Jordan Patterson and Hayley Peterson, Deputy Attorneys General, for Defendant and Respondent.

Latham & Watkins, Robert C. Crockett, Kathryn M. Davis and James R. Repking for Real Party in Interest and Respondent.

## Opinion

**CHIN, J.**—This case requires us to consider the California Coastal Commission's (Commission) exercise of permit authority under the California Coastal Act of 1976 (Coastal Act) (Pub. Resources Code, § 30000 et seq.)[1] in connection with a proposed development project that straddles the coastal zone boundary. In issuing a permit in this case, the Commission found that as conditioned, the part of the proposed project within the coastal zone is in conformity with the Coastal Act's policies and requirements. The opponents of the permit request contend that the Commission, based on an incorrect construction of the Coastal Act, improperly refused to consider impacts within the coastal zone of the part of the proposed project outside the coastal zone. The Court of Appeal upheld the Commission's reading of the Coastal Act and its decision. We affirm the Court of Appeal's judgment.

---

[1] Unless otherwise indicated, all further statutory references are to the Public Resources Code.

FACTUAL BACKGROUND[2]

Respondent Catellus Residential Group (Catellus) proposed to build a development with 114 houses on a 44-acre parcel of property in the City of Los Angeles (City), approximately one mile from the ocean and near the Ballona Wetlands. All of the new houses would be built on top of a bluff that is outside the "coastal zone" as defined by section 30103. To access 85 of the houses, Catellus proposed to build a road—Street A—that would descend from the top of the bluff, down its face, to State Highway 1. The bluff face is within the coastal zone, as would be approximately one-half of Street A. Construction of Street A would require substantial grading across the last remaining bluff in the area. Catellus also proposed to locate related infrastructure under Street A, including a storm water pipe to convey runoff from the bluff top to a detention basin below. In carrying out the proposed project, Catellus also proposed to construct a public access view park along the bluff rim, to revegetate over 10 acres of bluff face within the coastal zone, and to purchase and dedicate to open space 15 off-site lots along the bluff face inside the coastal zone.

Because part of the proposed project, including part of Street A, involves "development in the coastal zone," Catellus must "obtain a coastal development permit." (§ 30600, subd. (a).) In fact, because the City does not have a certified local coastal program but has adopted procedures for issuing coastal development permits, Catellus must get two such permits: one from the City and one from the Commission. (See §§ 30519, subd. (a), 30600, subd. (b), 30601.) Catellus thus applied to the City for a coastal development permit, as well as other approvals and permits required under provisions other than the Coastal Act. After preparing an environmental impact report (EIR) for purposes of complying with the California Environmental Quality Act (CEQA) (§ 21000 et seq.), the City granted Catellus's coastal development permit request and approved the project.

Catellus then applied to the Commission for a separate coastal development permit. At the same time, petitioners Sierra Club, Spirit of the Sage Council, and Ballona Ecosystem Education Project (collectively, Sierra Club) appealed the City's coastal permit approval to the Commission pursuant to section 30625.[3] In a combined report addressing both the permit request and the appeal, the Commission's staff recommended permit approval conditioned on elimination of Street A. However, a majority of the Commission voted to

---

[2] The facts regarding the proposed development are taken from the Court of Appeal's opinion and are not disputed.

[3] Other aspects of the City's project approval were challenged, and ultimately upheld, in a separate action. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733 [21 Cal.Rptr.3d 676, 101 P.3d 563].)

delete staff's "no Street A" recommendation, to grant Catellus's permit request for construction of Street A, and to deny Sierra Club's appeal. The Commission made extensive findings in support of its decision, including the following: "The bluff top . . . is not in the Commission's jurisdiction" and "it is not in the Commission's power to regulate development on the bluff top."

Sierra Club challenged the Commission's actions through several petitions for writ of mandate filed in the superior court. As here relevant, Sierra Club alleged that the Commission should have denied the permit request because the project as a whole—including activities both inside and outside the coastal zone—is not in conformity with the Costal Act's "management policies and development standards" for protecting "scenic views" and environmentally sensitive habitat areas (ESHA's). Regarding scenic views, Sierra Club alleged in relevant part that the proposed location of the houses near the coastal zone boundary would "result in significant impacts to scenic resources" inside the coastal zone, and that under section 30251, the Commission should not have issued a permit until Catellus "set back" the houses on the bluff top—which is outside the coastal zone—"far enough from the bluff edge to avoid or eliminate" those impacts. Regarding ESHA's, Sierra Club alleged in relevant part that proposed activities on the bluff top, "outside of the coastal zone," would produce "adverse . . . impacts" to "the Ballona Wetlands, an ESHA located directly adjacent to the site's northerly boundary," and that under section 30240, subdivision (b), the Commission should not have issued a permit until Catellus "sited and designed" the bluff top part of the project so as "to prevent" these impacts. In support of its position, Sierra Club argued that the Coastal Act authorizes the Commission to deny a permit request "based on the effects inside the coastal zone of development outside" the coastal zone, especially where the proposed activities inside and outside the coastal zone are "part of one and the same project."

In responding to these claims, the Commission relied principally on section 30604, subdivision (d) (section 30604(d)), which states: "No development or any portion thereof that is outside the coastal zone shall be subject to the coastal development permit requirements of [the Coastal Act], nor shall anything in [the Coastal Act] authorize the denial of a coastal development permit by the commission on the grounds the proposed development within the coastal zone will have an adverse environmental effect outside the coastal zone." This provision, the Commission argued, "prohibits [it] from exercising its powers on development outside the coastal zone" and, contrary to Sierra Club's assertion, precludes it from denying "a coastal permit based on the effects inside the coastal zone of development outside" the coastal zone. Sierra Club's contrary view, the Commission explained, "ask[s] [the Commission] to do indirectly what the Legislature has explicitly stated [it]

can't do directly," i.e., "subject" portions of the proposed development "outside the coastal zone . . . to the coastal development permit requirements of [the Coastal Act]."[4] (§ 30604(d).)

Sierra Club disagreed with the Commission's view of section 30604(d), arguing that this provision "specifically does *not* preclude denial of a coastal permit based on the effects inside the coastal zone of development outside." On the contrary, Sierra Club asserted, under the Coastal Act, the Commission "must consider all Project impacts (within and outside the coastal zone) affecting the coastal zone." According to Sierra Club, "jurisdiction" and the duty to "minimiz[e] . . . impacts" under the Coastal Act "extends [the Commission's] authority to control the generation point(s) of adverse effects originating outside the coastal zone (causing impacts to resources within the coastal zone)." Thus, Sierra Club maintained, the Commission had erred in "fail[ing] to assess the impacts" of proposed activities outside the coastal zone "on the Ballona Wetlands ESHA" and in issuing a permit without requiring Catellus to mitigate the "adverse coastal impacts" inside the coastal zone "arising from houses being built along the bluff edge."

The superior court denied relief. As relevant here, it found "substantial evidence" in the record to support the Commission's conclusion that, consistent with the Coastal Act, the proposed activities "in the coastal zone and subject to the coastal development permit" are "sited and designed to . . . protect views" and will "not significantly degrade the Ballona Wetlands . . . ESHA." It also found that, contrary to Sierra Club's assertion, "the Commission was not required to consider alternatives to the entire project but rather properly limited its review to alternatives to . . . those portions of the project within the coastal zone and the Commission's jurisdiction."

Sierra Club appealed, arguing in relevant part that the Commission had erred in issuing the permit without "consider[ing] the adverse impacts in the coastal zone of project activities originating in the portion of the project site located outside of the coastal zone." As in the superior court, in the Court of Appeal, Sierra Club specifically focused on the adverse scenic impacts within the coastal zone of the houses to be built on the bluff top, and the adverse environmental impacts to the Ballona Wetlands ESHA of project activities and land uses on the bluff top. In response, the Commission maintained

---

[4] The Commission's argument in the superior court closely mirrored the argument Catellus had previously made to the Commission during its permit proceedings. Relying on section 30604(d), Catellus argued during those proceedings that "the Commission cannot lawfully do indirectly, by denying a permit for development within the Coastal Zone based on the impacts of the portion of that development which is outside the coastal zone, what it could not do directly."

that section 30604(d) "expressly prohibit[s]" the Commission from denying Catellus's permit request based on a "find[ing] that the houses [to be built outside the coastal zone] will adversely impact the coastal zone." The Commission also maintained that it "has no authority to require greater setbacks for the homes or to require less density." Likewise, citing section 30604(d), Catellus argued that the Commission lacked "authority to deny or condition a project on the basis of changes to the Larger Project outside the Coastal Zone."

The Court of Appeal affirmed the superior court's decision. Agreeing with the Commission and Catellus and relying on section 30604(d), the court rejected Sierra Club's argument that the Commission was "statutorily obligated" to "reject the development inside the coastal zone" based on adverse impacts within the coastal zone of "that portion of the project outside the coastal zone." The court found that in refusing to deny the permit request on this basis, the Commission had "respected the boundaries on its power set out for it by the Legislature." Finally, finding substantial evidence in the record to support the Commission's conclusion "that the portions of the Project inside the coastal zone are consistent with the environmental policies of the Coastal Act," the court affirmed the superior court's denial of relief.

We then granted Sierra Club's petition for review.

## DISCUSSION

As in the Court of Appeal, Sierra Club argues here that the Commission erred in declining to base its decision regarding a permit for proposed activities within the coastal zone on "the cumulative environmental impacts *in* the coastal zone of project activities located outside" the coastal zone. More specifically, Sierra Club asserts that the Commission should have denied the permit request based on "the visual and scenic impacts in the coastal zone" of the proposed "blufftop modifications" and the "adverse impacts" of those proposed modifications "on the Ballona Wetlands' ecosystem." According to Sierra Club, issuance of the permit despite these impacts within the coastal zone violates sections 30251 and 30240, subdivision (b). The former provision states in relevant part: "Permitted development shall be sited and designed to protect views to and along the ocean and scenic coastal areas . . . [and] to be visually compatible with the character of surrounding areas . . . . New development in highly scenic areas . . . shall be subordinate to the character of its setting." (§ 30251.) The latter provision specifies that "[d]evelopment in areas adjacent to [ESHA's] . . . shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat and recreation areas." (§ 30240, subd. (b).) Sierra Club argues that its position is consistent with

"the plain meaning" and "legislative history" of section 30604(d) and with "the purposes of the Coastal Act."

In response, the Commission agrees that in making a permit decision regarding "development inside the coastal zone," it "may consider impacts in the coastal zone of the portions of the project outside the coastal zone" and "may properly . . . act to prevent" those impacts "to the extent [they] are related to the development inside the coastal zone." In fact, the Commission maintains, it actually "did consider such impacts when it made its decision" here.

However, the Commission argues, what it refused to do, and what it may not do under the "plain" and "unambiguous" language of section 30604(d), is "deny a permit for development inside the coastal zone where the impacts of that development have been fully mitigated and the only purpose for denying the permit would be to indirectly regulate development outside the coastal zone." The Commission first explains that under the "plain meaning" of section 30604(d), it "has no permit jurisdiction over the residential subdivision which will be located outside of the coastal zone." Thus, "the Commission cannot impose a condition directly reducing the number of homes outside the coastal zone or increasing the setback of the homes from the bluff edge." The Commission then argues that adopting Sierra Club's position— that the Commission, although finding Street A to be "consistent with the Coastal Act" and to have no unmitigated "adverse impacts," must nevertheless deny the permit request "based solely on th[e] impacts" within the coastal zone of activities outside the coastal zone—would provide "an indirect route to achieve these same results." This, the Commission contends, "would violate" section 30604(d) by requiring "the Commission to do indirectly what the Legislature has told it it may not do directly," i.e., "subject[] development outside of the coastal zone to the [Coastal] Act's permit requirements." In other words, the Commission asserts, Sierra Club is improperly trying to "leverage" the Commission's "approval over Street A, which the Commission found will have no unmitigated impacts, to force changes in portions of the [project] over which the Commission has no permit jurisdiction." In short, the Commission argues, it "properly considered impacts from outside the coastal zone as they related to the development inside the coastal zone and as necessary to find the coastal zone development consistent with the Coastal Act," and properly declined to "abuse the limitations on its authority imposed by the Legislature by leveraging its permit jurisdiction to regulate the project outside the coastal zone." Catellus agrees with the Commission's position.

■   We conclude that the Commission's construction of the Coastal Act is correct under the governing statutory framework. The Coastal Act, section

30600, subdivision (a), provides in relevant part that "any person . . . wishing to perform or undertake any development in the coastal zone, other than a facility subject to Section 25500, shall obtain a coastal development permit." On its face, this section does not specify how its permit requirement applies to projects that straddle the coastal zone boundary. That subject is addressed in section 30604(d), which, as noted above, provides: "No development or any portion thereof that is outside the coastal zone shall be subject to the coastal development permit requirements of [the Coastal Act], nor shall anything in [the Coastal Act] authorize the denial of a coastal development permit by the commission on the grounds the proposed development within the coastal zone will have an adverse environmental effect outside the coastal zone." As to that part of a proposed project "subject to the provisions of" the Coastal Act, "the standards" for determining "the permissibility of [the] proposed development[]" are set forth in chapter 3 of the Coastal Act (§ 30200 et seq.). (§ 30200, subd. (a).) Where, as here, no certified "local coastal program" governs, a coastal development permit "shall be issued" upon a "find[ing] that the proposed development is in conformity with Chapter 3." (§ 30604, subd. (a).)

This statutory framework authorizes the Commission, in determining whether proposed development within the coastal zone is in conformity with the Coastal Act's standards, to consider whether that proposed development takes into account or addresses impacts within the coastal zone of proposed development outside the coastal zone, at least, as the Commission states, "to the extent these impacts are related to the development inside the coastal zone." This conclusion is fully consistent with the Legislature's express command that the Coastal Act "be liberally construed to accomplish its purposes and objectives." (§ 30009.) It is also fully consistent with section 30604(d), through which the Legislature has specifically addressed the scope of the Commission's authority over projects that straddle the coastal zone boundary. Regarding such a project, that section places two limits on the Commission: (1) it may not "subject" the "portion" of the project "that is outside the coastal zone" to the Coastal Act's "permit requirements"; and (2) it may not deny a permit request "on the grounds the proposed development within the coastal zone will have an adverse environmental effect outside the coastal zone." (§ 30604(d).) The Commission clearly does not violate the second limitation merely by considering the impacts within the coastal zone of the part of the proposed project that is outside the coastal zone. Nor does it violate the first limitation, unless it considers the impacts originating outside the coastal zone in such a way as to "subject" the "portion" of the project "that is outside the coastal zone" to the Coastal Act's "permit requirements." (§ 30604(d).) In short, as Sierra Club asserts, nothing in section 30604(d) or any other relevant provision requires the Commission, in applying the Coastal

Act's standards to proposed development within the coastal zone, to "turn a blind eye to the impacts of project activities originating outside the coastal zone."

Here, for example, the record reflects several ways in which the Commission, in evaluating and approving Catellus's permit request for the proposed development inside the coastal zone, considered impacts within the coastal zone of the proposed development outside the coastal zone. In its findings, the Commission stressed that the distance the proposed "residential development" on the bluff top will be "set back . . . from the bluff face" furthers the Coastal Act's policies in several ways; consistent with section 30253, "this design solution" will "stabilize the bluff face" in the coastal zone, leave "the majority" of that bluff face "in an ungraded condition," and allow "the creation of a drainage setback area at the top of the bluff face" that will facilitate "diversion of drainage away from the bluff face." The Commission also noted that "[t]o further reduce erosion along the bluff face," Catellus will construct "four soldier pile/retaining walls . . . partially within the Coastal Zone." These "drainage improvements," the Commission explained, "will help to reduce siltation and pollution in . . . [the] Ballona Wetlands caused by uncontrolled storm water runoff down the bluff." The Commission also stressed Catellus's proposal to restore the already degraded bluff face through "implementation of a comprehensive bluff face revegetation plan." In several respects, that plan takes into account the fact that as part of the overall project, houses will be built nearby on the bluff top outside the coastal zone. It divides the part of the project within the coastal zone into several "sub-zone[s]" and specifies a different revegetation strategy for each subzone "based on [its] distance . . . from the residential units." It specifies that Catellus will use "native species . . . that will not have to be extensively cleared to protect the homes from fire." It also specifies that the restoration "will be considered successful" only when, among other things, the revegetated bluff face "resists invasion by exotic plant species." The Commission next stressed that the dedication to open space of 15 off-site lots inside the coastal zone will further the scenic preservation policies stated in section 30251 by "provid[ing] a visual buffer between the [Ballona] [W]etlands and the upland development." Moreover, these lots, given Catellus's promise "to keep [them] undeveloped and landscaped with native vegetation," will "provid[e] a landscape buffer between the wetland and upland areas that are landscaped with non-native plants," thus "prevent[ing] native invasive type plants from encroaching closer to the wetlands." More broadly, the Commission explained that under Catellus's proposal, "81 [percent] of the bluff face, within the Coastal Zone will be left ungraded" and will "serve as a buffer between the Ballona Wetlands and the residential areas to the south."

Consistent with these findings, the Commission imposed several "special conditions" on its issuance of a permit. It required Catellus to implement a water quality management program "to mitigate the potential development impact" by "collecting and directing runoff from all streets and residential lots through a system of filter devices . . . designed to trap sediment, particulates and other solids and remove or mitigate contaminants." It required Catellus to "carr[y] out and complete[]" bluff face "restoration . . . consistent with" its proposed revegetation plan and to submit a report addressing the bluff face's resistance to invasion by exotic plant species "[f]ive years from the date of the receipt of the Certificate of Occupancy for the residences" to be built on the bluff top. Finally, it required Catellus to execute and record deed restrictions dedicating to open space the 15 specified off-site lots inside the coastal zone and to include those lots in its "bluff face revegetation plan." Thus, the record makes clear that the Commission did in fact consider the ways in which the proposed development outside the coastal zone would produce impacts within the coastal zone, and the ways in which the proposed development inside the coastal zone, as further conditioned by the Commission to implement the Coastal Act's standards, would address those impacts. The Commission's actions in this regard were proper under the Coastal Act, and the parties do not suggest otherwise.

■ However, having found the proposed development within the coastal zone, as conditioned, to be "in conformity with" the Coastal Act's standards (§ 30604, subd. (a)), the Commission correctly declined to deny the permit request solely on the basis of the impacts within the coastal zone that Sierra Club alleges will result from the proposed development outside the coastal zone.[5] In its brief, Sierra Club concedes that the language of section 30604(d) prohibits the Commission from either "requir[ing] a coastal permit for the project elements outside the zone" or "condition[ing] . . . coastal permits" for project activities within the coastal zone "on changes to project elements sited outside the coastal zone." As the Commission asserts, for all practical purposes, that is precisely what Sierra Club asked the Commission to do. Given the Commission's finding that the proposed development within the coastal zone, as conditioned, is in conformity with the Coastal Act, a denial of the permit request for that development would simply be a means of effectuating change in the portion of the project outside the coastal zone.[6] Indeed, the record makes clear that one of Sierra Club's primary goals in

[5] The Commission's finding that the proposed development inside the coastal zone, as conditioned, is itself in conformity with the Coastal Act was affirmed by the Court of Appeal and is not within the scope of the issues on which we granted review. Thus, our analysis assumes that finding to be correct.

[6] The same could not be said of a denial based on the impacts inside the coastal zone of proposed development inside the coastal zone, even if that denial has incidental effects on portions of a project outside the coastal zone. Thus, if substantial evidence supports its decision, the Commission may properly deny a permit request based on impacts within the

opposing the permit request is to force changes to the project outside the coastal zone, specifically, the number and location of the proposed houses.[7] Under these circumstances, the Commission correctly found that Sierra Club was asking it "to do indirectly" what Sierra Club concedes the plain language of section 30604(d) prohibits: "condition[ing] . . . coastal permits" for project activities within the coastal zone "on changes to project elements sited outside the coastal zone." Moreover, given the language of section 30604(d), the Commission correctly rejected Sierra Club's request as an improper attempt to "leverage" the Commission's permit authority regarding proposed activities within the coastal zone "to force changes in portions of the [project] over which the Commission has no permit jurisdiction."

The evolution of section 30604(d) and its legislative history support this conclusion. The Coastal Act was first enacted in 1976 through passage of Senate Bill No. 1277 (1975–1976 Reg. Sess.). As initially proposed in Senate Bill No. 1277, the Coastal Act provided that "[i]f any portion of a parcel of land on which development is proposed lies within the permit area, the entire parcel is subject to the requirements of this division, where the proposed development could have a significant impact on any portion of the parcel within the permit area." (Sen. Bill No. 1277 (1975–1976 Reg. Sess.) as amended June 18, 1976, § 1 [proposed § 30111, subd. (e)].) This provision, had it been enacted, would have authorized the Commission to do precisely what Sierra Club argues it must do: base its permit decision on the adverse impacts within the coastal zone of proposed development outside the coastal zone, even where proposed development inside the coastal zone is otherwise in conformity with the Coastal Act. However, this provision was deleted before the bill's passage. (Sen. Bill No. 1277 (1975–1976 Reg. Sess.) as amended Aug. 2, 1976.) Instead, the Legislature added section 30604(d), which provided, as first enacted: "Nothing in this division shall authorize the denial of a coastal development permit on grounds that a portion of the proposed development not within the coastal zone will have adverse environmental impacts outside the coastal zone; provided, however, that the portion of the proposed development within the coastal zone shall meet the requirements of this chapter." (Stats. 1976, ch. 1330, § 1, p. 5990.) On its face, this provision said nothing about whether or how the Commission should consider impacts within the coastal zone of proposed activities outside the coastal zone.

---

coastal zone of proposed development inside the coastal zone, even if those impacts can be sufficiently mitigated only by changing the portion of a proposed project outside the coastal zone.

[7] At a hearing before the Commission, Sierra Club argued: "What this project comes down to is density. This project is too dense, and as a result contains almost no open space, requires destruction of the bluff face . . . and will result in unsightly visual impacts along the bluff edge. [¶] You can solve or mitigate all of these problems simply by reducing the greed factor in the number of homes, increasing the setbacks . . . and open space."

However, even before the Governor signed the Coastal Act into law, the Legislature recognized this potential ambiguity and took steps to address it. On August 31, 1976, the same day Senate Bill No. 1277 was enrolled and sent to the Governor, the Senate published a letter from Senator Smith, the author of the legislation, to the Secretary of the Senate. The letter stated: "During the debate on [Senate Bill No.] 1277, questions were raised relative to the interpretation of several provisions in the bill. . . . By including this letter in the Senate Journal, it is my purpose to clarify my intent, as the author of [Senate Bill No.] 1277, with respect to [some of those] provisions. I have made these same statements of intent before both Senate and Assembly Committees. Speaker McCarthy made similar representations, with my full concurrence, during the debate on this bill before the full Assembly. [¶] 1. The area within which the provisions of [Senate Bill No.] 1277 apply: [¶] The coastal commission's jurisdiction and the area to which the provisions of [Senate Bill No.] 1277 apply is the coastal zone and is limited entirely to that area inside the specifically delineated boundaries described in Section 17 of the bill and shown on the maps adopted by Committee . . . . The planning and regulatory requirements of this bill do not apply inland of these boundaries of the coastal zone . . . . [¶] The coastal commission has no direct permit or planning controls, pursuant to [Senate Bill No.] 1277, over any area or the activities of any other public agency outside the coastal zone (i.e., the commission may only deal with those activities occurring within the coastal zone). The area outside the specifically mapped coastal zone remains under the exclusive jurisdiction of existing units of local and state government and the authority, power, duties and responsibilities of the latter are not changed by this bill. The only charge to such agencies is (see Section 30200) that where their activities outside the coastal zone could have a direct impact on resources within the coastal zone, they must *consider* the effect of such activities relative to the policies of this bill. This provision *can be fully met* if such effects are considered by way of the environmental impact review process. No additional requirements are required or intended by this section."[8] (9 Sen. J. (1975–1976 Reg. Sess.) pp. 16967–16968.)

Seeking further guidance, the Commission asked the Attorney General for a legal opinion regarding its duties in considering permit requests for proposed projects that straddle the coastal zone boundary. (Cal. Atty. Gen.,

---

[8] Although we generally do not consider the understanding of individual legislators in construing statutes, the letter from Senator Smith is relevant because it purports to reiterate statements made to the Legislature during consideration of Senate Bill No. 1277 (1975–1976 Reg. Sess.) and because it was printed with the Senate's consent pursuant to Senator Smith's motion. (See *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 590 [128 Cal.Rptr. 427, 546 P.2d 1371].) It also provides relevant background for construing section 30604(d) in its current form.

Indexed Letter, No. IL 77-20 (Aug. 26, 1977).)[9] In August 1977, the Attorney General issued an opinion in response to the request, which stated that "if the portions of a project inside and outside the coastal zone are part of one development, then the commission may go on to determine whether portions outside the zone have significant environmental impacts inside the zone" (*ibid.*) and may "deny permits on the basis that the portion of [the] development outside the coastal zone would have adverse environmental impacts inside the coastal zone." (*Ibid.*)[10]

The Legislature quickly responded by amending section 30604(d) in 1978 to provide, as it does today, that "[n]o development or any portion thereof that is outside the coastal zone shall be subject to the coastal development permit requirements of" the Coastal Act. (Stats. 1978, ch. 1075, § 14, p. 3304.) An analysis of the 1978 amendment by the Senate Committee on Natural Resources and Wildlife explained the impetus and purpose of the amendment as follows: "In some instances the coastal zone boundary bisects a developable parcel, leaving part in and part out of the coastal zone. The Attorney General has issued an opinion stating that if such a parcel is proposed for subdivision, the commission may look at the entire parcel in making its decision. This [amendment] would expressly provide that no portion of a development outside the coastal zone shall be subject to coastal development permit requirements." (Sen. Com. on Natural Resources and Wildlife, Analysis of Sen. Bill No. 1873 (1977–1978 Reg. Sess.) Mar. 22, 1978, p. 3.) Other legislative analyses described the amendment's purpose as being to clarify that "only that portion of [a proposed] project within the coastal zone is subject to commission jurisdiction" (Assem. Com. on Resources, Land Use, and Energy, Analysis of Sen. Bill No. 1873 (1977–1978 Reg. Sess.) as amended May 8, 1978, p. 2; Assem. 3d reading analysis of Sen. Bill No. 1873 (1977–1978 Reg. Sess.) as amended Aug. 28, 1978), and to "make[] clear that coastal permit controls do not apply to any project or portion of any project that is outside the coastal zone." (Cal. Coastal Com., Analysis of Sen. Bill. No. 1873 (1977–1978 Reg. Sess.) Apr. 17, 1978, p. 1; Dept. of Finance, Analysis of Sen. Bill. No. 1873 (1977–1978 Reg. Sess.) May 8, 1978, p. 1.)

■ This legislative history demonstrates that regarding developments straddling the coastal zone boundary, the Legislature intended to divide

[9] At Sierra Club's request, we have taken judicial notice of an opinion letter from the Attorney General's office dated August 26, 1977, and addressed to the South Coast Regional Commission.

[10] The analysis in the opinion made no mention of the statements of intent published in the Senate Journal on motion of Senator Smith, the author of the Coastal Act.

permit authority between the Commission and all other local public entities having jurisdiction over portions of the development outside the coastal zone, with the Commission passing on permit requests for proposed development inside the coastal zone and the other entities passing on permit requests for proposed development outside the coastal zone.[11] Having concluded in this case that the proposed development inside the coastal zone, as conditioned, is in conformity with the Coastal Act, the Commission's refusal to deny the permit request for that development based on the impacts inside the coastal zone of the proposed development outside the coastal zone—i.e., its refusal to leverage its permit authority over the part of the project within the coastal zone to force changes in portions of the project over which it has no permit authority—is consistent with this intended division of authority. A contrary conclusion would be inconsistent with this intended division of authority; it would, where proposed development within the coastal zone is in conformity with the Coastal Act, effectively allow the Commission to overrule the decisions of other public agencies regarding proposed development outside the coastal zone and within their jurisdiction.

Despite the statutory language and the evidence of legislative intent, Sierra Club argues that its construction of section 30604(d) is consistent with "the manifest purposes of the Coastal Act," as reflected in several of its other provisions. Specifically, Sierra Club cites express legislative findings that the coastal zone "is a distinct and valuable resource of vital and enduring interest to all the people and exists as a delicately balanced ecosystem" (§ 30001, subd. (a)); that "to promote the public safety, health, and welfare, and to protect public and private property, wildlife, marine fisheries, and other ocean resources, and the natural environment, it is necessary to protect the ecological balance of the coastal zone and prevent its deterioration and destruction" (§ 30001, subd. (c)); and that "developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state and especially to working persons employed within the coastal zone." (§ 30001, subd. (d).) Sierra Club also cites the "basic goals" expressly stated in the Coastal Act, which are protecting, enhancing and restoring "the overall quality of the coastal zone environment and its natural and artificial resources" (§ 30001.5,

---

[11] Other sources confirm the Legislature's intent to place significant responsibility for implementing the Coastal Act on local authorities. (§ 30004, subd. (a) [stating the Legislature's finding that "[t]o achieve maximum responsiveness to local conditions, accountability, and public accessibility, it is necessary to rely heavily on local government and local land use planning procedures and enforcement"]; Sen. Democratic Caucus, Analysis of Senate Bill No. 1277 (Aug. 19, 1976) pp. 2–3 [Coastal Act contains "[p]rovisions for . . . the transfer of coastal management responsibilities back to local government [that would] alleviate[] previous problems regarding local control in the planning process"].)

subd. (a)); "[a]ssur[ing] orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state" (§ 30001.5, subd. (b)); "[m]aximiz[ing] public access to and along the coast and maximiz[ing] public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners" (§ 30001.5, subd. (c)); "[a]ssur[ing] priority for coastal-dependent and coastal-related development over other development on the coast" (§ 30001.5, subd. (d)); and "[e]ncourag[ing] state and local initiatives and cooperation in preparing procedures to implement coordinated planning and development for mutually beneficial uses, including educational uses, in the coastal zone." (§ 30001.5, subd. (e).) Finally, Sierra Club relies on the Legislature's express command that the Coastal Act "be liberally construed to accomplish its purposes and objectives." (§ 30009.)

For several reasons, Sierra Club's reliance on these provisions is unavailing. First, these broad statements regarding the general goals of the Coastal Act cannot overcome the express terms of section 30604(d), through which the Legislature has specifically addressed the limits of both the Coastal Act's reach and the Commission's power. Second, Sierra Club's construction would effectively transfer control over proposed development outside the coastal zone from local authorities to the Commission, simply because part of a proposed project happens to be inside the coastal zone, but the general statements Sierra Club cites reflect no legislative intent to effect such a transfer of control. By contrast, statements in the relevant legislative history discussed above indicate that the Legislature had precisely the opposite intent and envisioned that under the Coastal Act, "area[s] outside the . . . coastal zone . . . [would] remain[] under the exclusive jurisdiction of existing units of local and state government." (9 Sen. J. (1975–1976 Reg. Sess.) p. 16968.) This conclusion is consistent with the fact, as noted above, that in passing the Coastal Act, the Legislature considered, but rejected, proposed language that would have effected the transfer of control that would result under Sierra Club's construction. (Sen. Bill No. 1277 (1975–1976 Reg. Sess.) as amended June 18, 1976, § 1 [all portions of a parcel of land are "subject to the requirements of" the Coastal Act "[i]f any portion of [that] parcel . . . lies within the permit area" and "the proposed development could have a significant impact on any portion of the parcel within the permit area"].) We may not judicially write the deleted provision back into the Coastal Act simply because, as Sierra Club observes, "the coastal zone boundary does not immunize the zone against . . . impacts" from "project activities on the other side of the boundary."

Sierra Club next asserts that its construction "is in harmony with" the second sentence of section 30200, subdivision (a), which provides: "All public agencies carrying out or supporting activities outside the coastal zone

that could have a direct impact on resources within the coastal zone shall consider the effect of such actions on coastal zone resources in order to assure that the[] policies [set forth in Chapter 3 of the Coastal Act] are achieved." Sierra Club argues that this provision applies because in issuing a permit for Street A, which would provide access to houses built outside the coastal zone, the Commission is "supporting activities outside the coastal zone that could have a direct impact on resources within the coastal zone." (§ 30200, subd. (a).) The Commission responds that because it has no "permitting or other discretionary authority outside of the coastal zone and therefore by definition does not 'carry out or support' activities outside the coastal zone," the cited provision is simply inapplicable. In reply, Sierra Club concedes that the provision in question "is primarily aimed at agencies other than the Commission." However, citing the statute's reference to "[a]ll public agencies" (§ 30200, subd. (a)), Sierra Club argues that the Commission's view is "not supported by section 30200's all-inclusive language or the Coastal Act's mandate that its provisions be liberally construed to accomplish its purposes and objectives." According to Sierra Club, the Commission "is a public agency and whether through permitting of coastal development related to activities outside the coastal zone, or through other means, . . . can be called upon to support activities outside the zone."

Sierra Club's reliance on section 30200, subdivision (a), is unpersuasive. Initially, the relevant legislative history supports the Commission's view that the Legislature did not intend the second sentence of section 30200, subdivision (a), to apply to the Commission. As noted above, the letter of intent published in the Senate Journal in connection with the Coastal Act's passage explained that "existing units of local and state government" *other than* the Commission have "exclusive jurisdiction" over land outside the coastal zone and that in dealing with "activities outside the coastal zone [that] could have a direct impact on resources within the coastal zone," these *other* "agencies" are "charge[d]" under "Section 30200" with "consider[ing] the effect of such activities relative to the policies of" the Coastal Act. (9 Sen. J. (1975–1976 Reg. Sess.) p. 16968.) This discussion suggests that the Legislature viewed the second sentence of section 30200, subdivision (a), as being applicable only to agencies other than the Commission, as part of carrying out the division of permit authority the Legislature established in section 30604(d). Supporting this conclusion is the absence of anything in the 1978 amendment to section 30604(d) or its legislative history—which specifically addressed the scope of the Commission's authority over activities outside the coastal zone—even suggesting that the second sentence of section 30200, subdivision (a), has anything to say about this subject.[12]

---

[12] Nor does anything in the Attorney General's opinion letter, which specifically addressed the same subject and which was the stated impetus for the 1978 amendment, suggest that the second sentence of section 30200, subdivision (a), speaks to the Commission's authority.

Ultimately, however, we need not determine here whether the second sentence of section 30200, subdivision (a), never applies to the Commission, because even if we assume it does in some cases, it cannot apply as Sierra Club asserts. As explained above, the legislative history shows that as to proposed developments straddling the coastal zone boundary, section 30604(d) implements the Legislature's intent to divide permit authority between the Commission and other local public entities having jurisdiction over portions of a development outside the coastal zone. Sierra Club's construction of section 30200, subdivision (a), would largely undo that legislatively established division of authority; as we have already explained, where proposed development inside the coastal zone is in conformity with the Coastal Act, such a construction would effectively authorize the Commission to overrule the decisions of other public agencies regarding proposed development outside the coastal zone and within their jurisdiction. Thus, adopting Sierra Club's view of section 30200, subdivision (a), would be contrary to our duty to "harmonize" the "various elements" of the Coastal Act "in order to carry out the overriding legislative purpose as gleaned from a reading of the entire act. [Citation.]"[13] (*Wells v. Marina City Properties, Inc.* (1981) 29 Cal.3d 781, 788 [176 Cal.Rptr. 104, 632 P.2d 217].)

Sierra Club next argues that the Commission's construction of section 30604(d) is inconsistent with the Commission's "information disclosure requirements" under CEQA. According to Sierra Club, CEQA requires the Commission to "disclose and publicly review in its staff reports the reasonably foreseeable effects in the coastal zone of the whole project because, under CEQA, environmental 'effects' or 'impacts' to be considered by agencies, and integrated in their decisionmaking procedures (see § 21006), include not only direct or primary effects caused by the project, but also indirect or secondary effects which 'are later in time or farther removed in distance, but are still reasonably foreseeable.' [Citations.]" "[L]ikewise," Sierra Club asserts, CEQA "requires agencies to account for cumulative impacts in their decisionmaking." Based on these alleged requirements, Sierra Club "asks [us] to hold that the Commission has a duty *under CEQA* to identify and evaluate all impacts on the coastal zone environment of a project that straddles the coastal zone boundary" (italics added) and "to refrain from approving an activity as proposed, if available feasible alternatives or mitigation measures would substantially lessen any significant adverse effect of the activity on the coastal zone environment."

---

[13] By *contrast, rejecting Sierra Club's view* of section 30200, subdivision (a), does not affect that provision's application to agencies other than the Commission. As noted above, Sierra Club concedes that the second sentence of section 30200, subdivision (a) "is primarily aimed at" those other agencies.

Contrary to Sierra Club's assertion, nothing in CEQA authorizes or requires the Commission, notwithstanding its finding that proposed development inside the coastal zone is in conformity with the Coastal Act, to deny a permit request for that development based on the impacts within the coastal zone of proposed development outside the coastal zone. On the contrary, several provisions of CEQA preclude us from using that act to expand the Commission's authority beyond the limits set forth in the Coastal Act. Section 21004 provides that "[i]n mitigating or avoiding a significant effect of a project on the environment, a public agency may exercise only those express or implied powers provided by law *other than*" CEQA. (Italics added.) In an uncodified section of the legislation that enacted this provision, the Legislature explained that "clarification" of CEQA's "scope and meaning" had become "necessary because of contentions that" its provisions, "by themselves, confer on public agencies independent authority to . . . take . . . actions in order to comply with [CEQA's] general requirement . . . that significant effects on the environment be mitigated or avoided whenever it is feasible. . . ." (Stats. 1982, ch. 1438, § 4, p. 5484.) The Legislature went on to explain that section 21004 "clarif[ies]" that CEQA "confer[s] no such independent authority. Rather, [its] provisions . . . are intended to be used in conjunction with discretionary powers granted to a public agency *by other law* in order to achieve the objective of mitigating or avoiding significant effects on the environment when it is feasible to do so. . . . In order to fulfill [CEQA's] requirement [that feasible mitigating actions be taken], a public agency is required to select from the various powers which have been conferred upon it *by other law*, those which it determines may be appropriately and legally exercised . . . ." (Stats. 1982, ch. 1438, § 4, p. 5484, italics added.) As these comments demonstrate, the Legislature passed section 21004 to preclude us from doing precisely what Sierra Club's now asks us to do: use CEQA as tool to expand the Commission's authority beyond the Coastal Act's express limits.

Sierra Club's CEQA analysis is also inconsistent with section 21174, which provides in part: "To the extent of any inconsistency or conflict between the provisions of the . . . Coastal Act . . . and the provisions of [CEQA], the provisions of [the Coastal Act] shall control." Thus, to the extent, if any, the Commission's construction of section 30604(d)—which is consistent with the statutory language and legislative history—creates a conflict with some aspect of CEQA, CEQA itself resolves the conflict by *requiring* us to honor the limits of the Commission's authority under the Coastal Act and to reject Sierra Club's request that we use CEQA's provisions to override or expand those limits. Although the Commission relies on sections 21004 and 21174 in support of its position, Sierra Club simply ignores these statutes; we are not free to do so.

Sierra Club's CEQA analysis also ignores section 21002.1, subdivision (d), which explains the respective "responsibilit[ies]" of a "lead agency" and a "responsible agency" in reviewing an EIR and applying CEQA's command to mitigate or avoid a project's significant environmental effects. Whereas the lead agency is "responsible for considering the effects, both individual and collective, of all activities involved in a project," "[a] responsible agency [is] responsible for considering *only the effects of those activities involved in a project which it is required by law to carry out or approve.*" (§ 21002.1, subd. (d), italics added.) In its CEQA discussion, Sierra Club maintains that as to Catellus's entire proposed project, the City is the lead agency and the Commission is "a responsible agency" within the meaning of CEQA. Assuming Sierra Club is correct, under CEQA's express terms, the Commission is "responsible for considering only the effects of those activities" within the coastal zone, which are the *only* project activities the Commission "is required by law to . . . approve." (§ 21002.1, subd. (d).) This provision directly refutes Sierra Club's argument that the Commission's construction of section 30604(d) conflicts with CEQA.

Finally, Sierra Club argues that the Commission's construction conflicts with its duties under the federal Coastal Zone Management Act (CZMA) (16 U.S.C. § 1451 et seq.). As relevant to Sierra Club's argument, CZMA requires "any applicant for a required Federal . . . permit to conduct an activity, in or outside of the coastal zone, affecting any land . . . use or natural resource of the coastal zone of that state" to "provide" the federal "permitting agency a certification that the proposed activity complies with the enforceable policies of the state's [federally] approved [coastal zone management] program." (16 U.S.C. § 1456(c)(3)(A).) CZMA also requires "the state or its designated agency" to "notify" the federal permitting agency "that the state concurs with or objects to the applicant's certification." (*Ibid.*) By statute, the Commission is the California agency responsible for providing most of these CZMA notifications (§ 30330), and the Coastal Act is part of California's federally approved "coastal zone management program . . . for purposes of" CZMA. (§ 30008; see also *American Petroleum Institute v. Knecht* (C.D.Cal. 1978) 456 F.Supp. 889, 895.) In requesting federal approval, the Commission described how it "intend[ed] to carry out its responsibilities in connection with [CZMA's] consistency provisions."[14] Regarding proposed activities "[w]ithin the coastal zone" requiring a federal permit, the Commission explained that "a Coastal Commission permit will be required" and that "issuance of a Coastal Commission permit . . . will be deemed to be a determination by the State that the proposed Federal . . . permit activity is consistent with [California's coastal] management program, and no further

---

[14] At Sierra Club's request, we have taken judicial notice of part of the document the Commission submitted in requesting federal approval of California's coastal management program.

certification will be required." According to Sierra Club, because the Commission's issuance of a permit also constitutes its CZMA concurrence that a proposed activity is consistent with California's coastal zone management program, even where the Commission has determined that proposed activities within the coastal zone are in conformity with the Coastal Act, the Commission's disposition of a permit request must be based on an assessment of, in the words of CZMA, proposed "activit[ies] . . . outside of the coastal zone, affecting any land . . . use or natural resource of the coastal zone." (16 U.S.C. § 1456(c)(3)(A).) Sierra Club further asserts that because the project at issue here "straddl[es] the coastal zone boundary," the Commission's refusal to base its permit decision solely on the impacts within the coastal zone of the proposed activities outside the coastal zone is inconsistent with CZMA and "create[s] an issue of conflict preemption."

■ Sierra Club's argument fails because it rests on an incorrect understanding of CZMA. Sierra Club is correct that the Commission's issuance of a coastal development permit constitutes its CZMA concurrence that a proposed activity is consistent with California's coastal management program. However, that fact does not, as Sierra Club asserts, establish that the Commission must base its permit decisions on whether proposed activities outside the coastal zone will have impacts inside the coastal zone, or that a permit approval constitutes a representation that it has considered such activities. One of the administrative regulations implementing CZMA provides that "[i]f described in a State's management program, the issuance . . . of relevant State permits can constitute the [designated] State agency's consistency concurrence . . . if the [designated] State agency ensures that the State permitting agencies or the [designated] State agency review individual projects to ensure consistency with all applicable State management program policies . . . ."[15] (15 C.F.R. § 930.6(c) (2004).) ■ Because this regulation was promulgated by "the federal agency charged with administering CZMA," it is "entitled to deference by the courts." (*Secretary of Interior v. California* (1983) 464 U.S. 312, 320, fn. 6 [78 L.Ed.2d 496, 104 S.Ct. 656].) ■ Under it, the Commission's issuance of a permit for project activities inside the coastal zone does not create a conflict with CZMA so long as the Commission ensures that agencies issuing permits for proposed activities outside the coastal zone are reviewing those activities for "consistency with all applicable State management program policies." (15 C.F.R. § 930.6(c) (2004).)[16]

---

[15] These regulations in title 15 of the Code of Federal Regulations, which were promulgated by the National Oceanic and Atmospheric Administration (NOAA) of the Commerce Department, will hereafter be referred to as NOAA regulations.

[16] Although section 930.6(c) of the NOAA regulations does not define the term "State permitting agencies," section 923.41(a)(2) of those regulations provides that under CZMA, "[t]he state chosen agency or agencies (*including local governments, area-wide agencies,*

This conclusion is consistent with other NOAA regulations that generally describe CZMA's structure and approach. According to those regulations, CZMA's requirement that a state designate a single responsible agency "should not be viewed as confining or otherwise limiting the role and responsibilities which may be assigned to this agency. It is up to the State to decide in what manner and to what extent the designated State agency will be involved in actual program implementation or enforcement." (15 C.F.R. § 923.47(b)(2) (2004).) In other words, the requirement "is designed [merely] to establish a single point of accountability . . . for monitoring of management activities." (15 C.F.R. § 923.47(b)(1) (2004).) Thus, "[d]esignation does not imply that this single agency need be a 'super agency' or the principal implementation vehicle. It is, however, the focal point for proper administration and evaluation of the State's program and the entity to which [the federal government] will look when monitoring and reevaluating a State's program during program implementation." (*Ibid.*) This explanation of CZMA's structure reinforces the conclusion that the Commission's construction does not create an impermissible conflict with CZMA.

For the reasons explained above, we agree with the Court of Appeal that the Commission, having found the proposed development within the coastal zone, as conditioned, to be "in conformity with" the Coastal Act's standards (§ 30604, subd. (a)), correctly declined to deny the permit request solely on the basis of the impacts within the coastal zone that Sierra Club alleges will result from the proposed development outside the coastal zone.

Sierra Club raises two additional challenges to the permit approval here, both based on the assertion that although Commission staff reviewed the final EIR certified by the City in connection with its consideration of Catellus's proposed project, the Commissioners did not. As support for its assertion, Sierra Club relies on the declaration attached to its reply brief in the superior court, in which Sierra Club's counsel recounted his telephone conversation with "the coastal program analyst in the Commission's South Coast Area Office assigned to the [Catellus] project." According to the declaration, the program analyst told counsel that "Commission staff had not provided the [C]ity's EIR to the Commissioners." Sierra Club asserts that by failing to

---

*regional agencies, or interstate agencies*) must have the authority for the management of the coastal zone." (15 C.F.R. § 923.41(a)(2) (2004), italics added.) This latter regulation mirrors the express language of CZMA, which provides that a state's coastal management plan may not be federally approved unless "[t]he State, acting through its chosen agency or agencies (*including local governments, areawide agencies, regional agencies, or interstate agencies*) has authority for the management of the coastal zone in accordance with the management program." (16 U.S.C. § 1455(d)(10), italics added.) Thus, both CZMA itself and its implementing regulations contemplate that local governments qualify as "State permitting agencies." (15 C.F.R. § 930.6(c) (2004).)

review the City's EIR, the Commission members violated the CEQA Guidelines,[17] which provide that "[t]he decisionmaking body of a public agency shall not delegate the following functions: [¶] (1) Reviewing and considering a final EIR . . . prior to approving a project." (Cal. Code Regs., tit. 14, § 15025, subd. (b)(1).) Sierra Club also asserts that because the Commissioners did not themselves review the City's EIR, the Court of Appeal erred in partially relying on that EIR to find that substantial evidence supports the Commission's decision.

■ For several reasons, we reject Sierra Club's arguments. First, they depend on evidence that is not part of the administrative record. By statute, review of the Commission's decision to grant a permit is by way of a "writ of [administrative] mandate in accordance with Section 1094.5 of the Code of Civil Procedure." (Pub. Resources Code, § 30801.) " 'The general rule' " in such actions is that judicial review " 'is conducted solely on the record of the proceeding before the administrative agency. [Citation.]' [Citation.]" (*Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 101 [63 Cal.Rptr.2d 743].) A reviewing court may receive additional evidence only if that evidence "in the exercise of reasonable diligence, could not have been produced or . . . was improperly excluded at the hearing before" the administrative agency. (Code Civ. Proc., § 1094.5, subd. (e); see also *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 79, fn. 6 [118 Cal.Rptr. 34, 529 P.2d 66].) Thus, in reviewing the Commission's decision, courts are "confined to the record before the Commission unless" the petitioner shows it "could not have produced" the new evidence "in the exercise of reasonable diligence or unless relevant evidence was improperly excluded at the administrative hearing." (*State of California v. Superior Court* (1974) 12 Cal.3d 237, 257 [115 Cal.Rptr. 497, 524 P.2d 1281] (*State of California*).) Here, because Sierra Club has made no attempt to establish either of these prerequisites, consideration of the statement in counsel's declaration would be improper.[18] (See *City of Fairfield v. Superior Court* (1975) 14 Cal.3d 768, 775–776 [122 Cal.Rptr. 543, 537 P.2d 375] (*City of Fairfield*); *Pomona Valley Hospital Medical Center v. Superior Court, supra,* 55 Cal.App.4th at p. 101 ["absen[t] . . . a proper preliminary foundation showing that one of the [statutory] exceptions . . . applies, it is error for the court to permit the record to be augmented"].)

---

[17] We use the term "CEQA Guidelines" to refer to title 14 of the California Code of Regulations, the administrative regulations for implementing CEQA promulgated by the California Resources Agency pursuant to section 21083.

[18] The record does not indicate whether either the superior court or the Court of Appeal considered the statement. In the superior court, Catellus objected to the proffered declaration, citing Code of Civil Procedure section 1094.5, subdivision (e). The record does not reflect a ruling on the objection. However, the superior court rejected Sierra Club's request that the court's statement of decision expressly admit the declaration into evidence. The Court of Appeal's decision is silent regarding the issue.

■ Second, Sierra Club's arguments ask us to do something we may not do: go behind the administrative record to "determine what material the Commission read and relied upon in reaching its determination . . . ." (*State of California, supra,* 12 Cal.3d at p. 258.) "[I]n California," where an "administrative board" conducting "a quasi-judicial proceeding" states its findings, judicial "inquiry outside the administrative record to determine what evidence was considered . . . by the administrators" is "preclude[d]." (*City of Fairfield, supra,* 14 Cal.3d 768 at p. 779.) In *State of California,* we applied this rule to judicial review of permit decisions by the California Coastal Zone Conservation Commission. (*State of California, supra,* 12 Cal.3d at pp. 257–258.) We discern no reason not to apply the rule to the Commission, which, by statute, "succeed[ed] the California Coastal Zone Conservation Commission." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 163 [188 Cal.Rptr. 104, 655 P.2d 306].) Here, in granting Catellus's permit application, the Commission made extensive findings that specifically cited and relied on the City's EIR in numerous places.[19] In accordance with California law, we therefore reject Sierra Club's invitation to determine, based on evidence outside of the administrative record, whether the Commissioners, although citing the City's EIR in their findings, did not actually review that EIR.[20]

---

[19] Notably, as a ground for writ relief, Sierra Club complained that "[t]he Commission . . . improperly relied on a review of alternatives in the City of Los Angeles EIR . . . ."

[20] To the extent Sierra Club is arguing that the Commissioners' alleged violation of CEQA Guidelines section 15025 alone requires reversal, its argument suffers from another deficiency: untimeliness. Sierra Club never objected during Commission proceedings that the Commissioners failed to review the City's EIR. Although Sierra Club made this objection in its reply briefs in the superior court and the Court of Appeal, it did not argue that reversal was required for this reason. Rather, as Sierra Club explains in its opening brief here, in the trial court and the Court of Appeal, it raised this factual issue only as a basis for precluding the Commission from relying on the City's EIR to support its decision. "We do not ordinarily consider issues that were not raised below (Cal. Rules of Court, rule 29(b)(1); [citation]) and see no compelling reason to depart from the ordinary rule in this case." (*Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 828, fn. 3 [15 Cal.Rptr.2d 679, 843 P.2d 624].) Thus, we express no opinion regarding Sierra Club's view that CEQA Guidelines section 15025, subdivision (b)(1), is violated if the Commissioners personally review the report prepared by their own staff—which "serves as the functional equivalent of an EIR" for purposes of complying with CEQA (see § 21080.5; *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 113 [65 Cal.Rptr.2d 580, 939 P.2d 1280])—but only review staff summaries of EIR's prepared by other agencies. We also express no opinion as to whether any such violation necessarily requires reversal. (See *Sierra Club v. State Bd. Of Forestry* (1994) 7 Cal.4th 1215, 1236 [32 Cal.Rptr.2d 19, 876 P.2d 505] [reversal required "[o]nly if the manner in which an agency failed to follow the law is shown to be prejudicial, or is presumptively prejudicial"]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123, fn. 4 [26 Cal.Rptr.2d 231, 864 P.2d 502] [declining to decide whether CEQA guidelines "are regulatory mandates or merely aids to interpretation"].)

## Conclusion

For the reasons stated above, we affirm the Court of Appeal's decision.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.