[No. S131484. June 21, 2007.]

MUZZY RANCH CO., Plaintiff and Appellant, v.
SOLANO COUNTY AIRPORT LAND USE COMMISSION, Defendant and
Respondent.

376

**COUNSEL**

Howard Rice Nemerovski Canady Falk & Rabkin, Richard C. Jacobs and Jonathan W. Hughes for Plaintiff and Appellant.

Bingham McCutchen, Stephen L. Kostka and Marie A. Cooper for California Building Industry Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Dennis Bunting, County Counsel, and James W. Laughlin, Deputy County Counsel, for Defendant and Respondent.

OPINION

**WERDEGAR, J.**—In this case, we consider whether an airport land use commission conducted sufficient environmental review pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) when it adopted a land use compatibility plan that embraces existing restrictions on residential housing development for a large area near an Air Force base. We conclude the commission's adoption of the plan fell within an exemption from CEQA for projects that have no potential to cause a significant effect on the environment. (See Guidelines for Implementation of Cal. Environmental Quality Act, Cal. Code Regs., tit. 14, § 15061, subd. (b)(3).) Accordingly, we reverse the judgment of the Court of Appeal, which remanded for further proceedings.

## BACKGROUND

Solano County Airport Land Use Commission (Commission) was established, pursuant to the State Aeronautics Act (Pub. Util. Code, § 21001 et seq.), for the purposes of ensuring the orderly expansion of airports and promulgating appropriate land use measures in Solano County (*id.*, § 21670, subd. (a)(2)).

The Commission first adopted a land use plan for the Travis Air Force Base area in 1990, amending it in 1994. In 1999, the Commission determined that preparation of a new plan was appropriate owing to "changes in current and reasonably foreseeable aircraft operations at Travis Air Force Base, as well as development in the surrounding areas." In 2002, the Commission adopted by resolution the Travis Air Force Base Land Use Compatibility Plan (TALUP) that is the subject of this litigation. The Commission's resolution stated that "based on advice provided by its legal counsel, the Commission finds that the [TALUP] is not a 'project' subject to [CEQA] because it would not cause a direct physical change or a reasonably foreseeable indirect physical change in the environment."

The TALUP "sets forth land use compatibility policies applicable to future development in the vicinity" of Travis Air Force Base. The policies are designed "to ensure that future land uses in the surrounding area will be compatible with the realistically foreseeable, ultimate potential aircraft activity at the base" and are "intended to be reflected in the general plans and other policy instruments adopted by the entities having jurisdiction over land uses near" the base.

The TALUP also sets forth criteria for determining the compatibility with Travis Air Force Base's activities and mission of possible future development

in several geographic zones. This litigation has centered on the TALUP's regulation of "Compatibility Zone C," which the TALUP defines to encompass "locations exposed to potential noise [from the base] in excess of approximately 60 dB CNEL[1] together with additional areas occasionally affected by concentrated numbers of low-altitude . . . aircraft overflights," excluding developed residential areas within existing city limits. Although the TALUP does not provide precise acreage or square mile measurements, maps included in the plan make clear that Compatibility Zone C covers a large land area within Solano County, an area Muzzy Ranch Co. represents to be greater than 600 square miles extending more than 35 miles through Solano County.

The TALUP purports to restrict residential development within Compatibility Zone C to levels currently permitted under existing general plans and zoning regulations. Specifically, the TALUP states that "[n]o amendment of a general plan land use policy or land use map designation and no change of zoning shall be permitted if such amendment or change would allow more dwelling units in the affected area than are allowed under current zoning."

Five days after adopting the TALUP, the Commission filed with the Clerk of Solano County a "Notice of Exemption," citing California Code of Regulations, title 14, section 15061, subdivision (b)(3), and declaring that the Commission's action created "[n]o possibility of significant effect on the environment."

Muzzy Ranch Co. (Muzzy Ranch) is a limited partnership holding ownership interests in more than 1,000 acres within the area affected by the TALUP. Following the Commission's adoption of the TALUP, Muzzy Ranch filed a petition for writ of mandate and complaint for declaratory relief, contending that the adoption of the TALUP violated CEQA. The trial court denied the petition and entered judgment for the Commission. The Court of Appeal reversed, remanding with directions that the trial court issue a writ of mandate ordering the Commission to set aside its adoption of the TALUP. We granted the Commission's petition for review.

## DISCUSSION

█ In order to "[e]nsure that the long-term protection of the environment, consistent with the provision of a decent home and suitable living environment for every Californian, shall be the guiding criterion in public decisions" (Pub. Resources Code, § 21001, subd. (d)), CEQA and its implementing

---

[1] "60 dB CNEL" means 60 decibel community noise equivalent level, which represents the average daytime noise level during a 24-hour day, adjusted to account for the lower tolerance of people to noise during evening and nighttime relative to their daytime tolerance.

administrative regulations (CEQA Guidelines)[2] establish a three-tier process to ensure that public agencies inform their decisions with environmental considerations. (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].) The first tier is jurisdictional, requiring that an agency conduct a preliminary review to determine whether an activity is subject to CEQA. (CEQA Guidelines, § 15060; see Pub. Resources Code, § 21065.) An activity that is not a "project" as defined in the Public Resources Code (see § 21065) and the CEQA Guidelines (see § 15378) is not subject to CEQA. (CEQA Guidelines, § 15060, subd. (c)(3).)

■ The second tier concerns exemptions from CEQA review. The Legislature has provided that certain projects, such as ministerial projects and repairs to public service facilities of an emergency nature, are exempt. (Pub. Resources Code, § 21080, subd. (b)(1), (2); CEQA Guidelines, §§ 15061, subd. (b)(1), 15260.) In addition, pursuant to the Legislature's command (see Pub. Resources Code, § 21084, subd. (a)), the CEQA Guidelines list categorical exemptions or "classes of projects" that the resources agency has determined to be exempt per se because they do not have a significant effect on the environment. (CEQA Guidelines, § 15300 et seq.; see § 15061, subd. (b)(2).)

A project that qualifies for neither a statutory nor a categorical exemption may nonetheless be found exempt under what is sometimes called the "commonsense" exemption, which applies "[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment" (CEQA Guidelines, § 15061, subd. (b)(3)). (See generally *Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 113–118 [62 Cal.Rptr.2d 612].)

■ If a public agency properly finds that a project is exempt from CEQA, no further environmental review is necessary. (*No Oil, Inc. v. City of Los Angeles, supra*, 13 Cal.3d at p. 74.) The agency need only prepare and file a notice of exemption (see CEQA Guidelines, §§ 15061, subd. (d), 15062, subd. (a)), citing the relevant statute or section of the CEQA Guidelines and including a brief statement of reasons to support the finding of exemption (*id.*, § 15062, subd. (a)(4)). If a project does not fall within an exemption, the agency must "conduct an initial study to determine if the project may have a significant effect on the environment." (*Id.*, § 15063, subd. (a).) If there exists

---

[2] The term "CEQA Guidelines" refers to the regulations for the implementation of CEQA authorized by the Legislature (Pub. Resources Code, § 21083), codified in title 14, section 15000 et seq. of the California Code of Regulations, and "prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of [CEQA]." (CEQA Guidelines, § 15000.) In interpreting CEQA, we accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564, fn. 3 [276 Cal.Rptr. 410, 801 P.2d 1161].)

"no substantial evidence that the project or any of its aspects may cause a significant effect on the environment" (*id.*, § 15063, subd. (b)(2)), the agency must prepare a "negative declaration" that briefly describes the reasons supporting its determination (see *id.*, § 15070 et seq.).

■ CEQA's third tier applies if the agency determines substantial evidence exists that an aspect of the project may cause a significant effect on the environment. In that event, the agency must ensure that a full environmental impact report is prepared on the proposed project. (CEQA Guidelines, § 15063, subd. (b)(1); see also Pub. Resources Code, §§ 21100, 21151; CEQA Guidelines, § 15080 et seq.)

Muzzy Ranch's objections to the Commission's proceedings in this case focus on the first and second tiers of the CEQA process. With respect to the first (jurisdictional) tier, Muzzy Ranch contends that in its resolution adopting the TALUP, the Commission erred in concluding that adopting the TALUP was not subject to CEQA. With respect to the second (exemptions) tier, Muzzy Ranch contends the Commission violated CEQA by failing to examine the potential environmental impacts of its adopting the TALUP before filing its Notice of Exemption claiming the commonsense exemption. (CEQA Guidelines, § 15061, subd. (b)(3).)

Our inquiry into whether the Commission has complied with CEQA extends only to "whether there was a prejudicial abuse of discretion." (Pub. Resources Code, § 21168.5.) In a CEQA case, as in other mandamus cases, our review of the administrative record for error is the same as the trial court's; we review the agency's action, not the trial court's decision. (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 946 [91 Cal.Rptr.2d 66]; *Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1393 [61 Cal.Rptr.2d 297].) Throughout, we must bear in mind that "[t]he foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.'" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278].)

A. *First Tier*

■ Whether an activity constitutes a project subject to CEQA is a categorical question respecting whether the activity is of a general kind with which CEQA is concerned, without regard to whether the activity will actually have environmental impact. Thus, for CEQA's purposes, " '[p]roject' means an activity which may cause either a direct physical change in the

environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.) Whether an activity is a project is an issue of law that can be decided on undisputed data in the record on appeal. (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 794–795 [187 Cal.Rptr. 398, 654 P.2d 168], questioned on another point in *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 918 [13 Cal.Rptr.2d 245, 838 P.2d 1198].)

Here, we are concerned only with Public Resources Code section 21065, subdivision (a). That the Commission is a public agency and in adopting the TALUP it engaged in an activity within the meaning of CEQA is undisputed. The question is whether the Commission's adoption of the TALUP is the sort of activity that may cause a direct physical change or a reasonably foreseeable indirect physical change in the environment (Pub. Resources Code, § 21065) so as to constitute a project.

The Commission maintains it is not. The Commission contends that, as a matter of law, it had no duty to consider any displaced development the TALUP might generate by freezing residential densities in Compatibility Zone C, because such displacement is inherently too speculative to be considered a reasonably foreseeable effect of an airport land use compatibility plan. The Commission further argues that because the TALUP merely advises the jurisdictions it affects, it cannot be the legal cause of environmental changes that result if the jurisdictions follow its advice. We disagree on both counts.

## 1. *Displaced development*

The population of California is ever increasing. Our Legislature has declared that "[t]he availability of housing is of vital statewide importance, and the early attainment of decent housing and a suitable living environment for every Californian, including farmworkers, is a priority of the highest order." (Gov. Code, § 65580, subd. (a).) In order to "assure that counties and cities recognize their responsibilities in contributing to the attainment of the state housing goal" (*id.*, § 65581, subd. (a)), the Legislature requires that local jurisdictions in their land use planning "identify adequate sites for housing . . . and . . . make adequate provision for the existing and projected needs of all economic segments of the community" (*id.*, § 65583), including

"the locality's share of the regional housing need" (*id.*, § 65583, subd. (a)(1)). Thus, no California locality is immune from the legal and practical necessity to expand housing due to increasing population pressures.

Depending on the circumstances, a government agency may reasonably anticipate that its placing a ban on development in one area of a jurisdiction may have the consequence, notwithstanding existing zoning or land use planning, of displacing development to other areas of the jurisdiction. Zoning, as California courts recognize, "is subject to change[,] and amendment of a general plan is not a rare occurrence." (*Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 157 [39 Cal.Rptr.2d 54].) "[T]he planning and zoning amendment process has become in many communities one of 'piecemeal adjustment' by local planners and local legislators in response to development pressures." (*Devita v. County of Napa* (1995) 9 Cal.4th 763, 790 [38 Cal.Rptr.2d 699, 889 P.2d 1019].)

■ That further governmental decisions need to be made before a land use measure's actual environmental impacts can be determined with precision does not necessarily prevent the measure from qualifying as a project. For example, in *Fullerton Joint Union High School Dist. v. State Bd. of Education*, *supra*, 32 Cal.3d at pages 794–798, we considered whether the State Board of Education violated CEQA in approving a county committee's plan to form a new school district by dividing an existing one. We concluded that the Board of Education should have undertaken at least an initial environmental study of the secession plan's likely environmental impacts before approving it. (*Fullerton*, at p. 798.) In so doing, we expressly rejected the board's argument that its approval was not a CEQA project "merely because further decisions must be made before schools are actually constructed, bus routes changed, and pupils reassigned." (*Fullerton*, at p. 795.) That the board's approval of the plan was an essential step leading to potential environmental impacts, including construction of a new high school, was sufficient. (*Fullerton*, at p. 797.) Nor was the board's approval exempt from CEQA merely because it had to be ratified by the voters. (*Fullerton*, at p. 796.)

■ As earlier noted, the definition of project for CEQA purposes is not limited to agency activities that demonstrably *will* impact the environment. ". . . CEQA does not speak of projects which *will* have a significant effect, but those which may have such effect." (*No Oil, Inc. v. City of Los Angeles*, *supra*, 13 Cal.3d at p. 83, fn. 16.) Thus, contrary to the Commission's suggestion, nothing inherent in the notion of displaced development places such development, when it can reasonably be anticipated, categorically outside the concern of CEQA.

## 2. *Nonbinding advice*

The Commission repeatedly characterizes the TALUP as containing merely "recommendations," "requests" or "advice" to the affected jurisdictions. In so doing, the Commission errs. The TALUP speaks in mandatory terms. The TALUP, by its terms, "[d]efines the responsibilities of affected jurisdictions to modify their general plans and other policies for consistency with [Commission] policies and to submit certain land use development actions to the [Commission] for review." It provides that the County of Solano and its affected cities "shall utilize [the TALUP] as the basis for: (a) [m]odifying their respective general plans, zoning ordinances, and other local land use policies to assure that future land use development will be compatible with aircraft operations [and] (b) [m]aking planning decisions regarding specific development proposals involving the lands impacted by aircraft activity."

■ Pursuant to the statutory scheme authorizing it, the TALUP carries significant, binding regulatory consequences for local government in Solano County. (See, e.g., Gov. Code, § 65302.3; Pub. Util. Code, § 21676.) Government Code section 65302.3, subdivision (a) specifies that at all times a county's or city's general plan, as well as any applicable specific plans, "shall be consistent" with an airport land use commission's plan and that every affected county and city must amend its general and specific plans as necessary to keep them consistent with an applicable commission plan (see *id.*, subd. (b)).[3] Any local agency seeking to amend its general plan in a way that affects an area governed by an airport land use compatibility plan must first refer its proposed action to the responsible commission for a determination whether the proposed action is consistent with the airport land use plan. If the commission determines the amendment is not consistent, the agency may not enact it unless a two-thirds supermajority of the agency's governing body votes to override the commission's disapproval and the agency makes specific findings that its proposed action is consistent with the purposes of the State Aeronautics Act. (Pub. Util. Code, § 21676, subd. (b).) Thus, even in the event a local authority invokes the override provision, the State Aeronautics Act scheme still controls.

■ As Muzzy Ranch observes, under these statutes an airport land use compatibility plan can operate like a multijurisdictional general plan to trump

---

[3] In its entirety, Government Code section 65302.3 provides: "(a) The general plan, and any applicable specific plan prepared pursuant to Article 8 (commencing with Section 65450), shall be consistent with the plan adopted or amended pursuant to Section 21675 of the Public Utilities Code. [¶] (b) The general plan, and any applicable specific plan, shall be amended, as necessary, within 180 days of any amendment to the plan required under Section 21675 of the Public Utilities Code. [¶] (c) If the legislative body does not concur with any provision of the plan required under Section 21675 of the Public Utilities Code, it may satisfy the provisions of this section by adopting findings pursuant to Section 21676 of the Public Utilities Code."

the land use planning authority that affected jurisdictions might otherwise exercise through general and specific plans or zoning. The adoption of an airport land use compatibility plan and the amendment of a general plan are analogous to the extent each "embod[ies] fundamental land use decisions that guide the future growth and development of cities and counties" (*City of Livermore v. Local Agency Formation Com.* (1986) 184 Cal.App.3d 531, 539 [228 Cal.Rptr. 384, 230 Cal.Rptr. 867], citing, inter alia, *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 277–278, fn. 16 [118 Cal.Rptr. 249, 529 P.2d 1017]). That the enactment or amendment of a general plan is subject to environmental review under CEQA is well established. (*DeVita v. County of Napa, supra,* 9 Cal.4th at pp. 793–795; *Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 985 [28 Cal.Rptr.2d 305]; *City of Santa Ana v. City of Garden Grove* (1979) 100 Cal.App.3d 521, 532 [160 Cal.Rptr. 907].) "Although [they are] not explicitly mentioned in the CEQA statutes, general plans 'embody fundamental land use decisions that guide the future growth and development of cities and counties,' and amendments of these plans 'have a potential for resulting in ultimate physical changes in the environment.' [Citation.] General plan adoption and amendment are therefore properly defined in the CEQA guidelines [citation] as projects subject to environmental review." (*DeVita,* at pp. 793–794 [enactment or amendment of general plan]; see also *City of Livermore,* at p. 538 [revision of sphere of influence guidelines]; *City of Santa Ana,* at pp. 532–533 [enactment of general plan]; *Edna Valley Assn. v. San Luis Obispo County etc. Coordinating Council* (1977) 67 Cal.App.3d 444, 449 [136 Cal.Rptr. 665] [adoption of regional transportation plan]; see generally CEQA Guidelines, § 15378, subd. (a)(1).)[4]

In sum, the Commission erred in concluding that adopting the TALUP was not a project, i.e., was a type of governmental activity not subject to CEQA.

### B. *Second Tier*

 Five days after adopting the TALUP, the Commission filed a Notice of Exemption claiming the "commonsense" exemption of the CEQA Guidelines. (CEQA Guidelines, § 15061, subd. (b)(3).) As noted earlier, the commonsense exemption applies "[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant

---

[4] Section 15378, subdivision (a)(1) of the CEQA Guidelines explains in pertinent part that "project" includes "an activity directly undertaken by a public agency including but not limited to . . . enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof."

effect on the environment . . . ." (*Ibid.*)[5] The exemption can be relied on only if a factual evaluation of the agency's proposed activity reveals that it applies. (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 114.)

The Commission's original intention with respect to its Notice of Exemption is unclear. The notice assumes that the Commission's "Adoption of *Travis Air Force Base Land Use Compatibility Plan,* March 2002" is a CEQA project, but, as indicated, claims that action is exempt from CEQA. This approach is consistent with the resources agency's direction that, "[o]nce a lead agency has determined that an activity is a project subject to CEQA, a lead agency shall determine whether the project is exempt from CEQA." (CEQA Guidelines, § 15061, subd. (a).) But, as seen, the Commission has also argued that its adoption of the TALUP was, as a matter of law, *not* a project subject to CEQA.

In any event, in connection with its argument its adoption of the TALUP is exempt from CEQA, the Commission acknowledges that whether a particular activity qualifies for the commonsense exemption presents an issue of fact, and that the agency invoking the exemption has the burden of demonstrating it applies. (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 114.) An agency's duty to provide such factual support "is all the more important where the record shows, as it does here, that opponents of the project have raised arguments regarding possible significant environmental impacts." (*Id.* at p. 117.)

When filing its Notice of Exemption, however, the Commission did not cite any evidence. Instead, the Commission's notice merely invokes section 15061, subdivision (b)(3) of the CEQA Guidelines and states the legal conclusion that "Adoption of an Airport Land Use Plan is not a 'project' as defined by [Public Resources Code section] 21065."

Insofar as it failed to consider the record in determining that adopting the TALUP fell within the commonsense exemption, the Commission erred. "[T]he agency's exemption determination must [rely on] evidence in the

---

[5] In its entirety, CEQA Guidelines section 15061, subdivision (b)(3) provides: "(b) A project is exempt from CEQA if: [¶] . . . [¶] (3) The activity is covered by the general rule that CEQA applies only to projects which have the potential for causing a significant effect on the environment. Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA."

record demonstrating that the agency considered possible environmental impacts in reaching its decision." (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 117.) "The question whether alleged physical changes are reasonably foreseeable requires an examination of the evidence presented in the administrative record." (*Wal-Mart Stores, Inc. v. City of Turlock* (2006) 138 Cal.App.4th 273, 291 [41 Cal.Rptr.3d 420].) An agency obviously cannot declare "with certainty that there is no possibility that the activity in question may have a significant effect on the environment" (CEQA Guidelines, § 15061, subd. (b)(3)) if it has not considered the facts of the matter. Since legitimate questions were raised about the possible environmental impacts of the Commission's adopting the TALUP, the Commission had the burden to elucidate the facts that justified its invocation of CEQA's commonsense exemption. (*Davidon Homes,* at p. 117.)

The Commission, citing a Court of Appeal opinion superseded by ours in *Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839 [28 Cal.Rptr.3d 316, 111 P.3d 294], contends it had no obligation to consider any environmental impacts its adopting the TALUP would cause outside the plan's boundaries. *Sierra Club* is inapposite. There, we considered whether the California Coastal Commission, in light of statutory provisions restricting its permitting authority to areas *within* the coastal zone, was required when exercising that authority to consider the intracoastal zone impacts of a project *outside* the coastal zone. (*Id.* at p. 843.)

In this case, by contrast, no statute (in CEQA or elsewhere) imposes any per se geographical limit on otherwise appropriate CEQA evaluation of a project's environmental impacts. To the contrary, CEQA broadly defines the relevant geographical environment as "the area which will be affected by a proposed project." (Pub. Resources Code, § 21060.5.)[6] Consequently, "the project area does not define the relevant environment for purposes of CEQA when a project's environmental effects will be felt outside the project area." (*County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1582–1583 [27 Cal.Rptr. 3d 28].) Indeed, "the purpose of CEQA would be undermined if the appropriate governmental agencies went forward without an awareness of the effects a project will have on areas outside of the boundaries of the project area." (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 369 [110

---

[6] In its entirety, Public Resources Code section 21060.5 provides: " 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance."

Cal.Rptr.2d 579] (*Napa Citizens*).) Thus, the Commission is mistaken in its suggestion that agencies have no obligation under CEQA to consider geographically distant environmental impacts of their activities.

Notwithstanding its errors in this regard, however, the record before us demonstrates that the Commission reached the correct result. Determining whether a project qualifies for the commonsense exemption need not necessarily be preceded by detailed or extensive factfinding. Evidence appropriate to the CEQA stage in issue is all that is required. Under CEQA, a public agency is not always "required to make a *detailed* analysis of the impacts of a project on [future] housing and growth." (*Napa Citizens*, *supra*, 91 Cal.App.4th at p. 369 [discussing contents of environmental impact report].) "Nothing in the [CEQA] Guidelines, or in the cases, requires more than a general analysis of projected growth. The detail required in any particular case necessarily depends on a multitude of factors, including, but not limited to, the nature of the project, the directness or indirectness of the contemplated impact and the ability to forecast the actual effects the project will have on the physical environment." (*Ibid.*)

"In addition, it is relevant, although by no means determinative, that future effects will themselves require analysis under CEQA." (*Napa Citizens*, *supra*, 91 Cal.App.4th at p. 369.) And "[t]hat the effects will be felt outside of the project area . . . is one of the factors that determines the amount of detail required in any discussion. Less detail, for example, would be required where those effects are more indirect than effects felt within the project area, or where it [would] be difficult to predict them with any accuracy." (*Ibid.*; see also *Goleta Union School Dist. v. Regents of University of California* (1995) 37 Cal.App.4th 1025, 1032 [44 Cal.Rptr.2d 110]; CEQA Guidelines, § 15146, subd. (b).)

Most significantly, the CEQA Guidelines provide for streamlined review of projects that are consistent with existing general plans and zoning. (See CEQA Guidelines, § 15183.)[7] When approving a project that is consist-

---

[7] CEQA Guidelines section 15183 was promulgated on the authority of Public Resources Code section 21083.3, which provides, inter alia, that "[i]f a parcel has been zoned to accommodate a particular density of development or has been designated in a community plan to accommodate a particular density of development and an environmental impact report was certified for that zoning or planning action, the application of this division to the approval of any subdivision map or other project that is consistent with the zoning or community plan shall be limited to effects upon the environment which are peculiar to the parcel or to the project and which were not addressed as significant effects in the prior environmental impact report, or which substantial new information shows will be more significant than described in the prior environmental impact report." (Pub. Resources Code, § 21083.3, subd. (a).)

ent with a community plan, general plan, or zoning ordinance for which an environmental impact report already has been certified, a public agency need examine only those environmental effects that are peculiar to the project and were not analyzed or were insufficiently analyzed in the prior environmental impact report. (Pub. Resources Code, § 21083.3, subd. (b).)

Considered in light of these principles, the Commission's adoption of the TALUP falls within the commonsense exemption. (CEQA Guidelines, § 15061, subd. (b)(3).) One objective of the TALUP is to "minimize new residential development within areas significantly impacted by noise from Travis Air Force Base," most importantly within Compatibility Zone C, the area immediately surrounding Travis Air Force Base. The record reflects that the TALUP's provision implementing that objective simply incorporates existing county general plan and zoning provisions concerning the maximum number of permitted dwelling units. The record further reflects that most of the land in the vicinity of the base is in the land use jurisdiction of Solano County and that the county's existing plans for this area call for nearly all of it to remain in agricultural or open space uses.

Since, as the TALUP points out, "the presently planned land uses are, on the whole, compatible with Travis [Air Force Base] operations" and since the TALUP simply incorporates existing general plan and zoning law restrictions on residential housing density, any potential displacement the TALUP might otherwise have effected already has been caused by the existing land use policies and zoning regulations to which the TALUP is keyed. The only possible new effect of the TALUP is to make it more difficult for local agencies to change their policies in the future to permit increased development within Compatibility Zone C. (See Gov. Code, § 65302.3, subd. (a).) But there is no reason to assume the agencies will seek to take that step, even in the face of population pressures. The pertinent agencies *already* have restricted residential development in Compatibility Zone C, to the same extent the TALUP does, because Compatibility Zone C's location within the noise pattern of an active military base makes it less suitable for new housing than other areas.[8]

In sum, although the Commission erred in failing to reference the factual record in its Notice of Exemption, it was correct in determining that CEQA's commonsense exemption applied to its adoption of the TALUP. Accordingly, no further environmental review is required.

---

[8] Of course, further environmental review may be required should the Commission in the future alter the TALUP to be inconsistent with the Solano County general plan.

## CONCLUSION

For the foregoing reasons, the judgment of the Court of Appeal is reversed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied September 12, 2007, and the opinion was modified to read as printed above.