Filed 7/14/15  Save Our Schools v. Barstow Unified School Dist. Bd. of Ed. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| SAVE OUR SCHOOLS, | |
| Plaintiff and Appellant, | E060759 |
| v. | (Super.Ct.No. CIVBS1300156) |
| BARSTOW UNIFIED SCHOOL DISTRICT BOARD OF EDUCATION, | O P I N I O N |
| Defendant and Respondent. | |

APPEAL from the Superior Court of San Bernardino County.  Gilbert G. Ochoa, Judge.  Reversed.

Johnson & Sedlack, Raymond W. Johnson, Abigail A. Smith, Kimberly A. Foy, and Kendall Holbrook for Plaintiff and Appellant.

Atkinson, Andelson, Loya, Ruud & Romo, John W. Dietrich, Jennifer D. Cantrell, Paul Z. McGlocklin, and S. Pete Serrano for Defendant and Respondent.

1

# I.  INTRODUCTION

Defendant and respondent, Barstow Unified School District Board of Education (the District), approved closing two of its elementary schools, Thomson Elementary School (Thomson) and Hinkley Elementary School (Hinkley), and transferring their students to other district "receptor" schools.  The District found that the school closures and student transfers were exempt from environmental review under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] because they fell within CEQA's categorical exemption for "minor additions" to schools (§ 21080.18; Cal. Code Regs., tit. 14, § 15314 (Guidelines) [public school closures resulting in "minor additions to existing schools . . . where the addition does not increase original student capacity [i.e., enrollment capacity of a transferee school] by more than 25% or ten classrooms, whichever is less" are categorically exempt from CEQA]).[2]

A citizens group, plaintiff and appellant, Save Our Schools (SOS), petitioned the trial court for a writ of mandate setting aside the District's resolutions approving the closures and transfers and finding them exempt from CEQA.  The petition was denied and SOS appeals, claiming:  (1) insufficient evidence supports the District's determinations that the closures and transfers were exempt from CEQA; (2) if the

---

[1]  All further statutory references are to the Public Resources Code unless otherwise indicated.

[2]  All references to the Guidelines are to the state CEQA guidelines.  (Guidelines, § 15000 et seq.)  The Guidelines are binding on all public agencies in California in implementing the provisions of CEQA.  (Guidelines, §§ 15000-15001.)

closures are exempt, SOS met its burden showing that two exceptions to CEQA's categorical exemptions—the "cumulative impacts" and the "unusual circumstance" exceptions—applied to the closures and transfers (Guidelines, § 15300.2, subds. (b), (c)); and (3) the District improperly treated each school closure as a separate project for purposes of CEQA.

We reverse the judgment denying SOS's writ petition and remand the matter to the trial court with directions to order the District to reconsider its exemption determinations. (See *Ford Motor Co. v. NLRB* (1939) 305 U.S. 364, 374 [permitting remand for further evidence to be taken or additional findings to be made upon essential points]; Cal. Adm. Hearing Practice (Cont.Ed.Bar 2d ed. 2014) Decision and Review, § 8.121, pp. 8-79 to 8-80.) The administrative record contains insufficient evidence to support the District's exemption determinations. Specifically, the record contains insufficient evidence of the "original student capacity" that is, their enrollment capacity before the transfers, of any of the receptor schools. (Guidelines, § 15314.) Further, the District informed the public that the transfer students could choose which receptor school to attend.

For these reasons, it was impossible for the District to determine that the closures and transfers fell within the minor additions to schools exemption. (*East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 174 (*East Peninsula*) [because school district allowed students to choose which transferee school to attend it was "impossible" for the district to "properly determine compliance with section 15314" of the Guidelines]; *San Lorenzo Valley Community Advocates for*

3

*Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139

Cal.App.4th 1356, 1387-1389 (*San Lorenzo*) [proper compliance with Guidelines,

§ 15314 requires knowledge of receptor school's original student capacity, or physical

capacity to house students].)

## II.  BACKGROUND

At public meetings of its board in May, June, and December 2012, the District

made it publicly known that it was considering closing two schools, among other options,

in order to meet its financial obligations in future school years.  Student enrollment in the

entire district had been declining since the 2006-2007 school year, and the District

projected it would be unable to meet its financial obligations for the 2013-2014 and 2014-

2015 school years unless it made substantial cuts in expenditures.

On February 22, 2013, the District held a "Hinkley School Reorganizational

Meeting" at Hinkley Elementary School.  A notice of the meeting advised that enrollment

in all district schools had declined by approximately 1,000 students since the 2006-2007

school year.[3]  At a public meeting of its board on February 26, 2013, the District

addressed its superintendent's recommendation that it close Hinkley and Thomson

---

[3]  The record shows that on February 14, 2013, there were 5,827 students enrolled in all district schools, some 1,500 fewer than during the 2005-2006 school year when 7,313 students were enrolled.

4

beginning in the 2013-2014 school year, and transfer their students to other district schools.[4]

At the February 26, 2013, meeting, the District informed the public that students from Hinkley and Thomson could choose to transfer to any one of several receptor schools. The designated receptor schools for Hinkley, a K-8 school, were Lenwood Elementary School (K-6), Skyline North Elementary School (K-6), and Barstow Jr. High School (7-8). The designated receptor schools for Thomson, a K-6 school, were four other K-6 schools, Henderson Elementary School, Skyline North Elementary School, Cameron Elementary School, and Crestline Elementary School.

Thus, students from Hinkley and Thomson could elect to transfer to Skyline North Elementary School. At the February 26 meeting, a speaker asked what would happen if all of the transfer students chose to transfer to Skyline North. District Superintendent Jeff Malan responded: "When we look at the number of students that are involved, I don't believe that would be the . . . full capacity of the Skyline North [E]lementary [School]." Another speaker then commented: "It doesn't seem like the school capacity's been investigated enough"

Near the close of the February 26, 2013, meeting, the District adopted resolutions Nos. 29 and 30, approving, respectively, the closures of Thomson and Hinkley for the 2013-2014 school year and subsequent years. The District estimated the closures would

---

[4] It is unclear from the record whether the District made it publicly known, before February 22, 2013, that it was considering closing either Hinkley or Thomson.

5

save the District $600,000 annually. In each resolution, the District found the closures and the resulting transfers of students to the "receptors" schools were exempt from CEQA under section 21080.18 and the "minor additions" to schools exemption of Guidelines section 15314. A notice of exemption for each closure was recorded on March 6, 2013.

In March 2013, SOS, a self-described "after-formed unincorporated association" comprised of individuals "adversely affected by the [p]roject" and the District's "failure to comply with the law," petitioned the trial court for a writ of mandate setting aside the District's "project approvals" or resolutions approving the closures, including the District's determination that the closures were exempt from CEQA. SOS sought injunctive relief in the event the District closed the schools pending the adjudication of the writ petition. The District closed the schools in the spring of 2013, following the close of the 2012-2013 school year. Following a January 2014 hearing, the trial court issued a written ruling denying SOS's writ petition. This appeal followed.

### III. DISCUSSION

A. *CEQA's Three-tier Review Process*

An overview of CEQA's three-tier process will aid in understanding the context in which the District determined that the two school closures and resulting transfers of students to the receptor schools were exempt from CEQA. CEQA and the Guidelines establish a three-tier environmental review process, in order "to ensure that public agencies inform their decisions with environmental considerations." (*Muzzy Ranch Co.*

6

*v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380 (*Muzzy Ranch*);

*Committee to Save the Hollywoodland Specific Plan v. City of Los Angeles* (2008) 161

Cal.App.4th 1168, 1185; Guidelines, § 15002, subd. (k) [describing three-tier process].)

The first tier is known as the "preliminary review" process and requires the agency

to make two determinations:  whether the proposed activity is a project and, if so,

whether the project is exempt from CEQA.  (*San Lorenzo*, *supra*, 139 Cal.App.4th at pp.

1372-1373, 1380; *Association for Protection Etc. Values v. City of Ukiah* (1991) 2

Cal.App.4th 720, 726; Guidelines, §§ 15060, 15061.)  "[F]or CEQA to apply, the activity

or decision at issue must constitute a 'project' under the statute.  CEQA applies only to

'discretionary *projects* proposed to be carried out or approved by public agencies . . . .'

(§ 21080, subd. (a), italics added.)"  (*San Lorenzo*, *supra*, at p. 1376.)

A project is exempt from CEQA if (1) it is exempt by statute (§ 21080, subd. (b);

Guidelines, § 15061, subd. (b)); (2) it is subject to a "categorical exemption" in sections

15301 to 15333 of the Guidelines *and* the application of the categorical exemption is not

barred by an *exception* set forth in section 15300.2 of the Guidelines; or (3) it is subject to

the "commonsense" exemption, which applies when "it can be seen with certainty that

there is no possibility that the activity in question may have a significant effect on the

environment."  (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380; *San Lorenzo*, *supra*, 139

Cal.App.4th at pp. 1380-1381; Guidelines, § 15061, subd. (b)(3).)

If an agency properly determines a project is exempt from CEQA, the agency is

not required to conduct any additional review under CEQA.  (*Muzzy Ranch*, *supra*, 41

7

Cal.4th at p. 380, citing *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74.)
This means the agency is not required to proceed to the second tier of the CEQA review process and conduct an initial study to determine whether the project will have any significant environmental effects. (Guidelines, § 15063 [initial study follows preliminary review]; *San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1373; cf. *Muzzy Ranch*, *supra*, at pp. 380-381 [describing second tier as involving exemption determinations].) Nor is the agency required to proceed to the third tier and prepare a negative declaration (if the agency determines, following the initial study, that the project will have no significant environmental effects, with or without mitigation) or an environmental impact report (if the agency determines the project will have significant environmental effects). (*Muzzy Ranch*, *supra*, at p. 381; *San Lorenzo*, *supra*, at pp. 1373-1374.) But as one court has observed, "the amount of analysis and study involved at the preliminary review stage," in determining whether a categorical exemption and any *exceptions* to the exemption apply, is "similar to that involved at the 'second' stage where the agency conducts an initial study to determine whether the project has a significant effect on the environment (Guidelines, § 15000[, subd.] (k))." (*East Peninsula*, *supra*, 210 Cal.App.3d at p. 173.)

In addition, the procedural requirements of CEQA do not apply to an agency's exemption determination. (*San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1386.) This means the agency is not required to provide a "public comment period" or hold a public hearing on whether an exemption applies *before* the agency determines a project is exempt. (*Id.* at pp. 1385-1386, 1395 [public hearing not required for exemption determination];

8

*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 289-290 [public comment period not required for exemption determination].)  And, if the agency determines a project is exempt, it may, but is not required, to file a notice of exemption in order to shorten the limitations period for challenging its exemption determination.  (*Apartment Assn. of Greater Los Angeles v. City of Los Angeles* (2001) 90 Cal.App.4th 1162, 1171 [filing of notice of exemption triggers 35-day limitations period for challenging exemption determination; in the absence of a notice of exemption, a 180-day limitations period applies]; *San Lorenzo*, *supra*, at p. 1374 [notice of exemption may not be filed until after project is approved].)

B.  *Insufficient Evidence Supports the District's Determination That the Closures and Transfers Were Exempt from CEQA (§ 21080.18; Guidelines, § 15314)*

Section 21080.18 exempts from CEQA review "the closing of any public school in which kindergarten or any of grades 1 through 12 is maintained or the transfer of students from that public school to another school *if the only physical changes involved are categorically exempt* under Chapter 3 [of the Guidelines] (commencing with Section 15000) . . . ."  (Italics added.)  Section 21080.18 is not a true statutory exemption, but a categorical exemption because it only applies "if the only physical changes involved" in the public school closure are categorically exempt under the Guidelines.  (See *East Peninsula*, *supra*, 210 Cal.App.3d at pp. 166-169 [discussing legislative history preceding enactment of § 21080.18].)

9

The Guidelines contain 33 classes of categorically exempt projects.  (Guidelines, §§ 15301-15333.)  Each exempt class represents a class or category of projects that "ordinarily" have no significant environmental effects.  (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 851.)  Categorical exemptions are strictly construed, "in order to afford the fullest possible environmental protection." (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 697.)  Unlike statutorily exempt projects, which are "absolute" and not subject to exceptions, categorical exemptions are subject to exceptions in the Guidelines. (*Save the Plastic Bag Coalition v. County of Marin* (2013) 218 Cal.App.4th 209, 224; Guidelines, § 15300.2.)

In finding that the closures of Hinkley and Thomson and the resulting transfers of students from these schools to the receptor schools were exempt from CEQA, the District relied on section 21080.18 and the class 14 exemption for "minor additions" to schools. (Guidelines, § 15314.)  Guidelines section 15314 provides:  "Class 14 consists of minor additions to existing schools within existing school grounds where the addition does not increase original student capacity by more than 25% or ten classrooms, *whichever is less*. The addition of portable classrooms is included within the class 14 exemption."  (Italics added.)

In *San Lorenzo*, the court summarized its interpretation of the class 14 exemption as follows:  "A school closure and accompanying transfer of students is exempt from CEQA so long as any resulting physical changes are categorically exempt.  (§ 21080.18.)

10

Minor additions to the receptor school are categorically exempt.  (Guidelines, § 15314.) A minor addition is defined as the lesser of:  (1) the addition of 10 or fewer classrooms; or (2) an increase in original student capacity of 25 percent or less.  (*Ibid*.)  In this context, original student capacity means the receptor school's *preexisting physical ability* to house students" because CEQA is concerned *solely with physical changes to the environment.  (San Lorenzo*, *supra*, 139 Cal.App.4th at pp. 1387-1388, italics added.)  In other terms, the phrase "original student capacity" (Guidelines, § 15314) means the receptor school's "physical space for housing students" or "the number of students that can be accommodated physically at the receptor school," *before* the transfers are made as a result of other school closures.  (*San Lorenzo*, *supra*, at p. 1387.)

We review an agency's factual determination that a project is categorically exempt from CEQA for substantial evidence.  (*San Lorenzo*, *supra*, 139 Cal.App.4th at pp. 1386-1389; *Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1251.)  In determining whether substantial evidence supports an agency's exemption determination, we generally look only to the evidence in the administrative record at the time the agency made the exemption determination.  (*San Lorenzo*, *supra*, at p. 1387, citing *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573; see also *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 750 [""'Unless it can be demonstrated that the [agency's] actions are not grounded upon *any reasonable factual basis*, the courts should not interfere with [the agency's] discretion or substitute their discretion for that of the [agency].'"'"].)

11

SOS claims insufficient evidence supports the District's determination that the exemption for "minor additions" to schools (Guidelines, § 15314) applied to the closures of Thomson and Hinkley and the transfers of their students to the receptor schools. For purposes of CEQA,"'[s]ubstantial evidence' . . . means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion . . . ." (Guidelines, § 15384.) SOS argues there is no evidence in the administrative record indicating that the closures and transfers *would not* increase "original student capacity" at any one of the receptor schools "by more than 25% or ten classrooms, whichever is less." (Guidelines, § 15314.) We agree.

The record shows that on February 14, 2013, shortly before the District approved the closures and transfers on February 26, a total of 261 students attended Hinkley and 349 attended Thomson. Thus, assuming enrollment at Hinkley and Thomson would have been the same during the 2013-2014 school year, closing the two schools meant that 610 students would be transferred to the receptor schools.

The record also shows the numbers of students enrolled at each of the receptor schools on February 14, 2013. For Hinkley, a K-8 school, the receptor schools and their enrollments on February 14, 2013, were Lenwood (K-6), with 381 students, Skyline North (K-6), with 413 students, and Barstow Jr. High School (BJHS) (7-8), with 654 students. For Thomson, a K-6 school, the receptor schools and their enrollment on February 14, 2013, were Skyline North (K-6), again with 413 students, Henderson (K-6), with 466 students, Cameron (K-6), with 491 students, and Crestline (K-6), with 464

12

students.  These enrollment figures say nothing of the "original student capacity" or *enrollment capacity* of the receptor schools, however.  (Guidelines, § 15314.)

The record generally indicates that all of the District's K-6 schools, including the receptor K-6 schools (all except BJHS), were operating at 60 to 65 percent of their enrollment capacity in February 2013, and their enrollment had been declining for several years.  But the record contains no information concerning the "original student capacity," or original student *enrollment* capacity, of any of the receptor schools at the time of the transfers.  (Guidelines, § 15314; *San Lorenzo*, *supra*, 139 Cal.App.4th at pp. 1387-1388.)  On the record before us, there is no basis upon which to estimate each receptor school's enrollment capacity, or the number of students each receptor school could hold, for the 2013-2014 school year or any other school years.  It is possible that some of the receptor schools were operating at or near their enrollment capacity at the time of the transfers, while others were operating at less than 60 percent of their capacity.

This is a critical gap in the evidence.  Without it, insufficient evidence supports the District's determination that the closures of Hinkley and Thomson, and the resulting transfers of their former students to the receptor schools, were exempt from CEQA under the "minor additions" exemption.  (Guidelines, § 15314.)  Without knowing the enrollment capacity of each receptor school, it was impossible for the District to determine whether the transfers *would not* cause the enrollment at any of the receptor schools to exceed 125 percent of its enrollment capacity, or require fewer than 10 classrooms to be added to the receptor school.  (*Ibid.*; *San Lorenzo*, *supra*, 139

13

Cal.App.4th at pp. 1388-1389 [calculating impact of student transfers based on receptor school's "current capacity"]; *East Peninsula*, *supra*, 210 Cal.App.3d at pp. 174-175 [same, but, in dicta, calculating impact of transfers to another transferee school based on that transferee school's current *enrollment*].)

The District's representation to the public at the February 26, 2013, meeting—that students from Hinkley and Thomson would be able to choose which receptor school to attend—compounds the insufficiency of the evidence supporting the District's exemption determinations. At the meeting, the board members and the District superintendent appeared to assume there was more than sufficient enrollment capacity at the receptor schools, as a whole, to absorb the transfers, but the District did not indicate it would limit enrollment at any of the receptor schools in order to ensure that its enrollment would not exceed 125 percent of its enrollment capacity before the transfers, or require the addition of 10 or more new classrooms to the receptor school. (Guidelines, § 15314.)

The record indicates, for example, that approximatley 63 of the 261 transfer students from Hinkley would be in seventh and eighth grades in 2013-2014, and would have to be transferred to BJHS. BJHS, the District's only middle school, had total enrollment of 751 on February 14, 2013, comprised of seventh and eighth graders. Adding Hinkley's 63 students to BJHS would have increased BJHS's total enrollment to 814 for the 2013-2014 school year, an increase of 8.4 percent. But the key figure to know is BJHS's enrollment *capacity* before the transfers, not its total enrollment or total student head-count before the transfers.

14

Further, if all of Hinkley's remaining 198 grade K-6 students and all of Thomson's 349 grade K-6 students—a total of 547 students—elected to transfer to Skyline North Elementary School, then Skyline North's total enrollment would have more than doubled, from 422 students in 2012-2013 to 969 students in 2013-2014. But again, without knowing Skyline North's enrollment capacity before the transfers, we cannot conclude that sufficient evidence supports the District's determination that the transfers were exempt from CEQA under section 15314 of the Guidelines.

Lastly, the District argues the closures and transfers are exempt under section 15378, subdivision (b)(5) of the Guidelines, which states that "[o]rganizational or administrative activities of governments that will not result in direct or indirect physical changes in the environment" are not projects under CEQA. But as the District concedes, an increase in student enrollment "is not [a significant] environmental impact, *unless such increase exceeds the threshold required in CEQA Guidelines section 15314.*" (Italics added.) Thus, the District's argument that the exemption for organization and administrative activities applies begs the question of whether the increases in student enrollment at any of the receptor schools, as a result of the transfers, would not exceed the limitations of the minor additions exemption. (Guidelines, § 15314.) If the transfers exceeded those limitations, they were *not* exempt under Guidelines section 15378.

C. *Remand for Further Proceedings*

In sum, because the record contains insufficient evidence to support the District's determination that the transfers *would not* increase enrollment at any of the receptor

15

schools beyond the limits described in Guidelines section 15314, it is appropriate to remand the matter to the District for further proceedings. (See *Ford Motor Co. v. NLRB*, *supra*, 305 U.S. at p. 374 [permitting remand for further evidence to be taken or additional findings to be made upon essential points]; Cal. Adm. Hearing Practice, *supra*, Decision and Review, § 8.121, pp. 8-79 to 8-80.) On remand, the District may adopt a corrected decision, without considering additional evidence, if its exemption determinations may be corrected based on the record before it at the time it passed the resolutions approving the closures and transfers. (*Ford Motor Co. v. NLRB*, *supra*, at p. 374.) Alternatively, the District may consider additional evidence. (*Ibid.*)

If on remand the District relies on the minor additions exemption (Guidelines, § 15314), it must consider whether the closures and transfers (1) increased student enrollment at any of the receptor schools by 25 percent or more of the receptor school's original student capacity, before the transfers, and (2) caused the addition of more than 10 classrooms at any of the receptor schools. As we have explained, the total student enrollment *capacity* of each receptor school, before the transfers, is the critical evidence the District has to consider in determining whether the minor additions exemption applied to the two school closures and the resulting transfers of their students to the receptor schools. (*San Lorenzo*, *supra*, 139 Cal.App.4th at pp. 1388-1389.)

If the board determines, based on sufficient evidence, that the closures and transfers are categorically exempt under the minor additions exemption (Guidelines, § 15314) or any other categorical exemption, the burden will shift to SOS and any other

16

challengers to produce evidence that an exemption to the categorical exception applies (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1104-1105 (*Berkeley Hillside*); Guidelines, § 15300.2). On this appeal, SOS claims the cumulative impacts and unusual circumstance exemptions applied. (Guidelines, § 15300.2, subds. (b), (c).) On remand, SOS and other challengers will have an opportunity to produce evidence supporting these and any other potentially applicable exemptions. (See *East Peninsula*, *supra*, 210 CalApp.3d at pp. 172-173.)

For guidance on remand, we observe that the "cumulative impact" exception applies, "when the cumulative impact of successive projects of the same type in the same place, over time is significant." (Guidelines, § 15300.2, subd. (b).) In determining whether this exception applies, the District must consider the *cumulative impacts* of the closures and transfers together. For further guidance on remand, we observe that the economic and social effects of a project shall not be treated as significant effects on the environment. (Guidelines, §§ 15131, subd. (a), 15064, subd. (f)(6).)

The "significant effect" or "unusual circumstance" exception applies "where there is a reasonable possibility that the activity will have a significant effect on the environment *due to unusual circumstances*." (Guidelines, § 15300.2, subd. (c), italics added.) Recently, in *Berkeley Hillside*, the California Supreme Court held that, for this exception to apply, "it is not alone enough that there is a reasonable possibility the project will have a significant environmental effect; instead, . . . there must be 'a reasonable

17

possibility that the activity will have a significant effect on the environment *due to unusual circumstances*.'" (*Berkeley Hillside*, *supra*, 60 Cal.4th at pp. 1097-1105.)

The court explained: "[T]o establish the unusual circumstances exception, it is not enough for a challenger merely to provide substantial evidence that the project *may* have a significant effect on the environment, because that is the inquiry CEQA requires absent an exemption. (§ 21151.) Such a showing is inadequate to overcome the Secretary's determination that the typical effects of a project within an exempt class are not significant for CEQA purposes. On the other hand, evidence that the project *will* have a significant effect *does* tend to prove that some circumstance of the project is unusual. An agency presented with such evidence must determine, based on the entire record before it—including contrary evidence regarding significant environmental effects—whether there is an unusual circumstance that justifies removing the project from the exempt class." (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.)

Finally, on remand, the District should receive evidence from SOS and any other challengers on whether any exceptions to the minor additions and any other categorical exemptions relied on by the District applied to the closures and transfers. As noted, "the amount of analysis and study involved at the preliminary review stage," in determining whether a categorical exemption and any *exceptions* to the exemption apply, is "similar to that involved at the 'second' stage where the agency conducts an initial study to determine whether the project has a significant effect on the environment (Guidelines, § 15000[, subd.] (k))." (*East Peninsula*, *supra*, 210 Cal.App.3d at p. 173.)

18

Thus, on remand, the District should effectively conduct an initial study to determine whether any categorical exemptions and any exceptions to those exemptions applied. We realize this inquiry will be conducted in hindsight, because Hinkley and Thomson were closed in the spring of 2013 and their students were transferred to other schools in the 2013-2014 school year. Still, remand is necessary for the District to properly determine, based on sufficient evidence, whether the minor additions exemption or any other exemptions applied at the time of the closures and transfers, and for the District to consider whether any exceptions to such categorical exemptions applied.

D. *SOS's Claims Are Not Necessarily Moot*

The District claims that because Hinkley and Thomson were closed and their students were transferred to the receptor schools in the spring of 2013, this court can grant no effective relief on SOS's writ petition and the petition is therefore moot. SOS argues its petition is not moot because the District could reopen the schools. On the record before us, the writ petition is not necessarily moot.

If, upon remand, the District is unable to determine, based on substantial evidence, that the closures and transfers were exempt from CEQA at the time they were approved, or if the District improperly determines that no exception to any proffered categorical exemption applied, then the trial court and this court may be able to provide SOS effective relief by, for example, ultimately ordering the District to reopen the schools or take other steps to mitigate the adverse environmental effects—if any—of the closures

19

and transfers.  (See *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888.)

## IV.  DISPOSITION

The judgment denying SOS's writ petition is reversed.  The matter is remanded to the trial court for further proceedings consistent with this opinion.  SOS shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.