Filed 1/30/20; Certified for Publication 3/2/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ENVIRONMENTAL COUNCIL OF SACRAMENTO et al., | C076888 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201380001424CUWMGDS) |
| v. | |
| COUNTY OF SACRAMENTO et al., | |
| Defendants and Respondents; | |
| CORDOVA HILLS, LLC et al. | |
| Real Parties in Interest and Respondents. | |

Defendants County of Sacramento and the County Board of Supervisors (the County) approved Cordova Hills, a large master planned community comprised of residential and commercial uses and including a university (the Project).  Plaintiffs Environmental Council of Sacramento and the Sierra Club (Environmental Council) filed a petition for writ of mandate challenging the Project, which the trial court denied.

1

Environmental Council appeals, contending the Environmental Impact Report (EIR) contains a legally inadequate project description, an inadequate environmental impact analysis, fails to analyze impacts to land use, and the County failed to adopt feasible mitigation measures.  At the heart of Environmental Council's appeal is the contention that the university is not likely to be built and since the EIR assumes the buildout of a university it is deficient in failing to analyze the Project without a university.  We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

**The Project**

In 2007 real parties in interest Cordova Hills, LLC, Conwy, LLC, Cielo, LLC, and Grantline, LLC, collectively Cordova Hills Ownership Group (Landowners), submitted an application to the County to develop Cordova Hills.  Cordova Hills was a proposed master planned community.  In 2011 the County adopted a new 2030 general plan.  The Project was evaluated based on the criteria in the general plan, including an emphasis on master planning large special planning areas (SPA's) instead of piecemeal project evaluation in new growth areas.

In order to comply with the general plan planning principles, the Project was required to include an affordable housing plan, an urban services plan, a fiscal impact analysis, a public facilities financing plan, an air quality mitigation plan, a greenhouse gas plan, and a development agreement.

The Project is located on approximately 2,669 acres in southeastern Sacramento County.  Currently the site is used for grazing cattle and is undeveloped.

The Project's uses consist of residential, office, retail, a university campus, schools, parks, and a network of trails.  It will include high-density residential sites, low-density residential sites, and a large commercial area.  In addition, the Project provides for the construction of 8,000 residential units for a population of approximately 21,379.

The proposed university includes a campus population of 4,140, bringing the total population of the project to 25,519. The majority of the retail and office space will be located in a commercial area and will include restaurants, movie theatres, bookstores, home supply stores, and other retailers.

The EIR provides a description of the proposed university: "The SPA reserves approximately 224 acres of land for a future college campus. At the time of this writing, a specific university or other higher-education institution had not been identified for the site. The SPA includes detailed concept plans for the future university/college campus center. For the purposes of environmental analysis, the anticipated enrollment is 6,000 students (4,300 undergraduate and 1,700 graduate) and 2,036 total employees. A total of 65% of students were assumed to live on the campus (4,040 [*sic*] students). It was also assumed that the university/college campus center will require approximately 1,870,000 square feet of facilities. Note that the phasing described below is a conceptual plan, and that the actual buildout will progress over the long-term planning horizon in response to demand and in response to the needs of the specific university which is ultimately located here – it cannot be predicted with precision. The specific floor areas, buildings, and uses identified in the following phases are conceptual and not intended as specific building entitlements. None of the environmental analyses in the main chapters rely on any aspect of this phasing plan to assess impacts; impacts are based on full buildout of the entire area reserved for the university/college campus center."

Originally, the development application identified the University of Sacramento as the university tenant. In July 2011 the University of Sacramento withdrew from the Project. Under the development agreement, if a university is not located at the site within 30 years, then the land will be transferred to the County. During the 30-year window, the property owner may not seek or apply for a change in the land use designation. The development agreement requires the property owner to provide the County with annual updates on the status of finding a university for the site.

3

The development agreement also requires the property owner to establish a "University Escrow Account" requiring the payment of $2 million after the issuance of 1,000 building permits, and an additional $2 million after 1,750 building permits and a final $2 million after the issuance of 2,985 building permits. If a university is built, the County will release the escrow money to the university for campus-related operations. If a university does not locate on the site, the escrow funds will be released to the County for the purpose of attracting a university to the location.

**The Approval Process**

Landowners, the Project proponents, filed an amended project application in January 2010, after unsuccessfully filing an earlier application. In June 2010 the County published a notice of preparation for a draft EIR of the Project. The following January, the County released the draft EIR for public review and comment. After the County planning commission held a hearing on the draft EIR, the County released the final EIR in November 2012.

Approximately a month later, the County Board of Supervisors held a public hearing on the final EIR. The County certified the final EIR and adopted the CEQA (California Environmental Quality Act) findings of fact and statement of overriding considerations in January 2013.

The County's approvals under the final EIR included: (1) general plan amendments to move the urban policy area to include the Project site, change the land use diagram from general agriculture to other uses in the Project area, and amend the general plan transportation plan and bikeway master plan; (2) zoning ordinance amendments to adopt the Cordova Hills SPA to incorporate the Cordova Hills master plan, including design guidelines and development standards for the Project area; (3) a tentative subdivision map; (4) an affordable housing plan; (5) a development agreement; (6)

adoption of public facilities financing plan for the project; and (7) adoption of the Cordova Hills water supply master plan amendment.

Among the findings and statement of overriding considerations approved is a finding regarding the proposed university: "The Board finds that the Project's 223-acre university/college campus area provides the opportunity to attract a major employer of highly trained and educated workers such as university professors, school administrators, researchers and teaching assistants. The Board finds that there is demand for such an institution in California, and in the Sacramento region. In making this finding, the Board has determined that it is beneficial to have land already designated in a manner compatible with the use being sought; the need to go through a lengthy entitlement and permit process before construction can begin can be an important deterrent for major employers of this kind. Thus, the Project will attract and incentivize a higher-learning institution."

**The Subsequent Litigation**

In March 2013 Environmental Council filed a petition for writ of mandate. The trial court denied the petition, upholding the Board's certification of the final EIR and approval of the Project.

The court found the project description adequate under CEQA and that the EIR did not have to address the possibility that the university would not be built. In addition, the court held the EIR adequately disclosed and analyzed the Project's environmental impacts associated with air quality, traffic, and climate change. Nor was the County required to phase the Project as a mitigation measure and that the record did not support phasing the Project. Finally, the court determined Environmental Council failed to exhaust administrative remedies as to whether the EIR defers mitigation of climate change impacts by improperly treating the design of the Project as a mitigation measure.

This appeal followed.

# DISCUSSION

## I

### *Standard of Review*

In enacting CEQA (Pub. Resources Code, § 21000 et seq.), the Legislature declared its intention that public agencies responsible for regulations affecting the environment give prime consideration to preventing environmental damage when carrying out their duties. CEQA is to be interpreted to afford the fullest possible protection to the environment within the reasonable scope of the statutory language. (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.)

The EIR is the heart of CEQA. Its purpose is to give the public and government agencies the information about environmental consequences needed to make informed decisions, thus protecting both the environment and informed self-government. (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162 (*Bay-Delta*).)

When an agency prepares an EIR, it provides public officials and the public with details about a proposed project's consequences. The EIR lists the ways to potentially minimize any significant environmental effects, and presents alternatives to the project. By making this information available at a crucial moment when the merits of a project and its alternatives are under discussion, an EIR advances both environmental protection and informed self-government. (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 383.) CEQA does not necessarily call for disapproval of a project having a significant environmental impact, nor does it require the selection of the alternative most protective of the environmental status quo. (*Ibid.*) Instead, when economic, social or other conditions make alternatives and mitigation measures infeasible, a project may be approved despite its significant environmental effects if the lead agency adopts a statement of overriding considerations and finds the benefits of the project outweigh the potential environmental damage. (*Ibid.*)

6

" 'While foreseeing the unforeseeable is not possible, an agency must use its best efforts to *find out* and disclose all that it reasonably can.' " (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 726.) The EIR's sufficiency is reviewed in light of what is reasonably feasible, and we do not look for perfection but for adequacy, completeness, and a good faith effort at full disclosure. (*Bay-Delta, supra*, 43 Cal.4th at p. 1175.)

On review, the court considers whether the public agency committed a prejudicial abuse of discretion, either by failing to proceed in a manner required by law or by making conclusions unsupported by substantial evidence. (*Bay-Delta, supra*, 43 Cal.4th at p. 1161.) The court adjusts its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*).) If the dispute involves facts or conclusion, the court upholds the agency's findings if supported by substantial evidence. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392-393, 407 (*Laurel Heights*).)

We review the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as that of the trial court. We review the agency's action, not the trial court's decision; in that sense our review under CEQA is de novo. (*Bay-Delta, supra*, 43 Cal.4th at p. 1162.) We resolve reasonable doubts in favor of the administrative finding and decision. (*Laurel Heights, supra*, 47 Cal.3d at p. 393.)

## II

### *Adequacy of Project Description*

Environmental Council faults the EIR for failing to provide an adequate project description "because the construction and development of a university is uncertain and

7

unlikely. Substantial evidence indicates a strong likelihood that a university will never be built. Thus, the EIR's environmental analysis, which relies upon a university at full buildout, is based upon a falsehood and speculation."

An EIR is an informational document designed to provide both public agencies and the public at large with detailed information about the likely effects of a project on the environment; to list the ways in which significant effects might be minimized; and to discuss alternatives. At its essence, an adequate project description ensures CEQA's goal of providing information about a project's impacts is not rendered useless. (*Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 443.)

An EIR project description should include reasonably foreseeable future activities that are the consequence of project approval. It should address environmental effects of future action, if there is credible and substantial evidence that (1) it is a reasonably foreseeable consequence of the project, and (2) the future action will be significant in that it will likely change the scope and nature of the project and its environmental effects. Absent these factors, an EIR need not consider future action. However, any future action would have to be discussed in future CEQA review before the future action may be approved. (*Laurel Heights, supra*, 47 Cal.3d at p. 396; *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 738 (*Kings County*).)

Environmental Council argues, as it did before the trial court, that the construction of new universities has significantly decreased and universities face mounting financial and other pressures, including competition from online education, which make it difficult to construct, relocate, or expand facilities. In addition, the record indicates the extreme unlikelihood of successfully recruiting a new or existing university. The university intended for the project, and another university intended for a permitted Placer County site, both withdrew from consideration in the planning processes. Environmental Council also notes other sites in the Sacramento region are also seeking universities.

There is no doubt that attracting a major educational institution would be a daunting task. These difficulties were taken into account by the EIR, which imposed obligations on both the developer and the county designed to advance that goal. As the court found: "However, several conditions in the Development Agreement require the Developer to make good faith efforts to attract a university. Moreover, the County is required to locate a university for the Project if the Developer does not. [¶] At no time during the Development Agency's 30-year term may the Developer seek to change the designation of the Project property designated for university use; the Developer must report annually to the County on its progress in locating a university; the Developer must also deposit payments of $2 million (capped at $6 million) in an escrow account, if the university land is not transferred to a higher education institution by the time 1000, 1750, and/or 2985 residential building permits are issued; and the Developer must construct certain infrastructure to serve the university. Additionally, the Developer must return the land to the County to pursue a higher education use if it does not identify a university within 30 years. In such an event, the County may use the funds in the escrow account only for locating and building a university."

We agree with the trial court's assessment. We note that the County, in drafting the EIR was required to assume all phases of the Project, including the university, would be built. (*Vineyard, supra*, 40 Cal.4th at p. 431.)

In addition, the record contains numerous statements by educational figures and civic leaders regarding both the need for a university and the desirability of the location in question. The Project also sets forth numerous incentives to encourage a university tenant, including approximately $87 million of commitments to the university. In addition, the approved development agreement precludes the landowners from changing the use for the site; requires active pursuit of a university user and to report annually on these efforts; requires the landowners to make front-loaded escrow payments that would

9

be provided to the university; and require landowners to construct infrastructure to serve the university frontage in the first stage of development.

Environmental Council fails to present credible and substantial evidence to support its assertion that the proposed university is an illusory element of the project based on speculation and included only to minimize environmental effects. It is possible that the developer may fail to locate a university and will therefore return that portion of the Project land back to the County in 30 years. At that point, the County may decide to use the land for another purpose which would necessitate a subsequent EIR. CEQA does not require an EIR to discuss future developments which are unspecified or uncertain. "Such an analysis would be based on speculation about future environmental impact." (*Kings County, supra*, 221 Cal.App.3d at p. 739.) We find the Project description legally adequate. The EIR is not required to address the speculation that the university will not be built.

### III

#### *Adequacy of Environmental Impact Analysis*

Environmental Council contends the EIR misrepresents the significance of the Project's environmental impacts to air quality, climate change, and traffic because it mistakenly assumes the university will be built. In addition, Environmental Council asserts the EIR fails to adequately describe the significance of these impacts by not acknowledging that a university may not be constructed for some time.

CEQA requires that an EIR should be prepared with a sufficient degree of analysis in order to provide decisionmakers with sufficient information to enable them to make decisions which take into account environmental consequences. In assessing an EIR's analysis we look not for perfection, but for adequacy, completeness, and a good faith effort at full disclosure. (*Citizens to Preserve the Ojai v. County of Ventura* (1985) 176 Cal.App.3d 421, 429.)

10

Under CEQA, an EIR must identify and describe a project's significant environmental effects: direct, indirect and long-term. (Pub. Resources Code, § 21100, subd. (b)(1); Cal. Code of Regs., tit. 14, § 15126.2, subd. (a).)[1] Significant effects should be discussed in proportion to their severity and probability of occurrence. (Guidelines, § 15143.) An EIR must identify and describe any feasible mitigation measures that can be implemented to reduce or avoid each potentially significant environmental impact. (Pub. Resources Code, § 21100, subd. (b)(3); Guidelines, § 15126.4, subd. (a)(1).) The adequacy of an EIR is determined in terms of what is reasonably feasible, in light of factors such as the magnitude of the project at issue, the severity of its likely environmental impacts, and the geographic scope of the project. (Guidelines, § 15204, subd. (a).)

Environmental Council renews its claim that the EIR failed to adequately disclose the Project's impacts without the university. However, Environmental Council concedes that at the time the EIR was approved, the management district proposed additional mitigation measures to reach a 35 percent reduction in emissions and the County subsequently adopted changes to mitigation measure AQ-2 in accepting the management district's proposed changes.

Previously we found the EIR was not required to describe the Project in a way that contemplated the university would not be built. Nor do we find the EIR's analysis of air quality, climate change, and traffic impacts is erroneous because it did not consider the possibility the university would not be built, or might not be built for some time.

---

[1] The regulations implementing CEQA are codified at California Code of Regulations, title 14, section 15000 et seq., and are referred to as the State CEQA Guidelines (hereafter, Guidelines).

11

The EIR found that the specific impacts cited by Environmental Council would be significant and unavoidable. The County adopted findings of fact and a statement of overriding considerations recognizing these impacts, but found the other factors outweighed the impacts and supported the Project approval. We consider Environmental Council's challenges to the impacts to air quality, climate change, and traffic in turn.

**Air Quality**

Environmental Council argues the EIR misrepresents oxides of nitrogen ($NO_X$) and reactive organic gas (ROG) emissions because if the university is not built they would only be mitigated by 20 percent rather than 35 percent. $NO_X$ and ROG are types of ozone precursors and are identified by the Sacramento Metropolitan Air Quality Management District (District) as "criteria pollutants."

The EIR finds the Project will cause significant and unavoidable impacts to air quality by increasing $NO_X$ and ROG emissions beyond District's threshold of significance of 65 pounds per day. The Project would increase $NO_X$ and ROG emissions by 415.22 pounds per day and 857.40 pounds per day respectively. During the review process, the District, County, and the landowners developed an air quality management plan (Management Plan) to reduce these emissions by 35 percent. Even with this reduction, the EIR concludes the increases are still significant and unavoidable.

County added mitigation measure AQ-2 to address air quality concerns. In the final EIR, AQ-2 requires that the Project comply with the Management Plan and that any amendments to the Cordova Hills SPA shall not increase ozone precursor emissions beyond the 35 percent reduction unless the County approves a change to the Management Plan.

AQ-2 states: "Comply with the provisions of the Air Quality Management Plan dated June 1, 2011, and incorporate the requirements of this plan into the Cordova Hills Special Planning Area conditions. Also the following text shall be added to the Cordova Hills SPA: 'All amendments to the Cordova Hills SPA with the potential to result in a

12

change in ozone precursor emissions shall include an analysis which quantifies, to the extent practicable, the effect of the proposed SPA amendment on ozone precursor emissions.  The amendment shall not increase total ozone precursor emissions above what was considered in the AQMP for the entire Cordova Hills project and shall achieve the original 35% reduction in total overall project emissions.  If the amendment would require a change in the AQMP to meet that requirement, then the proponent of the SPA amendment shall consult with [District] on the revised analysis and shall prepare a revised AQMP for approval by the County, in consultation with [District]."

Therefore, if Project changes require alterations to the Cordova Hills SPA, for example if a university is not built, the changes cannot increase $NO_X$ and ROG emissions beyond that 35 percent reduction absent County approval.  AQ-2 undercuts Environmental Council's contention that EIR fails to adequately address air quality.

**Recirculation for Further Review**

In a related claim, Environmental Council contends the County was required to recirculate the EIR to address the revisions to mitigation measure AQ-2, based on the District and County's position that the AQ-2 would mitigate $NO_X$ and ROG emissions, even if the university were not built.  According to Environmental Council, the EIR fails to address this and instead the County improperly modified the mitigation measure in approving the final EIR.

CEQA requires a lead agency to recirculate an EIR when significant new information is added to the EIR after the draft EIR has been released to the public for review and prior to certification.  (Pub. Resources Code, § 21092.1.)  Significant information includes a "substantial increase in the severity of an environmental impact" that would result "unless mitigation measures are adopted that reduce the impact to a level of insignificance."  (Guidelines, § 15088.5; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1130.)  Recirculation is

intended to be the exception rather than the rule. (*Laurel Heights Improvement Assn.*, at p. 1132.)

Environmental Council argues the development of the Project without a university will result in air quality impacts that will be more significant than those discussed in the EIR and these air quality impacts are significant and unavoidable. According to Environmental Council, the Project's NOx and ROG emissions will be reduced by only 20 percent as opposed to 35 percent if a university is not built. Therefore, this difference in mitigation reduction is a substantial increase in the severity of the air emissions impacts requiring recirculation of the EIR.

The County asserts Environmental Council failed to exhaust its administrative remedies by failing to raise the issue during the administrative process. A party cannot maintain an action alleging that the EIR does not comply with CEQA unless the grounds for noncompliance were presented to the public agency orally or in writing during the public comment period or prior to the close of the public hearing on the project before the issuance of the notice of determination. Any objection must be sufficiently specific so that the agency has the opportunity to evaluate and respond. The party asserting the issue bears the burden of showing the issue was first raised at the administrative level. (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 926 (*Tracy*).)

Environmental Council asserts that a member of the public alerted the County in October 2012 of the need for recirculation because the EIR did not provide an adequate analysis of environmental impacts because of the uncertainty of the university being built. We will accept the assertion for purposes of argument and consider Environmental Council's recirculation contention.

According to Environmental Council, the air quality impacts are significant and unavoidable because the Project's $NO_X$ and ROG emissions will be reduced by only 20 percent as opposed to 35 percent if a university is not constructed. This difference in mitigation reduction is a substantial increase in air emissions requiring recirculation.

Environmental Council's argument overlooks the fact that mitigation measure AQ-2 requires a 35 percent reduction of $NO_X$ and ROG emissions if the SPA is amended, unless the County otherwise approves. We agree with the trial court's observation that "the impacts to $NO_X$ and ROG emissions vastly exceed the thresholds of significance, regardless of whether they are mitigated by 20% or 35%. Thus even accepting Petitioners' argument as true, it is debatable whether a 15% reduction in mitigation is a 'substantial increase' in the severity of these particular environmental impacts. Finally, the revisions to mitigation measures AQ-2 and CC-1 do not increase environmental impacts, much less substantially increase them." The difference in reduction of mitigation is not significant new information requiring recirculation.

**Climate Change**

Environmental Council contends that by assuming the university will be constructed, the EIR fails to adequately address climate change impacts, echoing their arguments against the EIR's analysis of air quality. Environmental Council concedes that mitigation measure CC-1 was revised to ensure that any future Project changes would not increase greenhouse gas emissions.

As revised, CC-1 states: "The following text shall be added to the Cordova Hills SPA: All amendments to the SPA **with the potential to change SPA-wide GHG emissions** shall include an analysis which quantifies, to the extent practicable, the effect of the Amendment on **SPA-wide** greenhouse gas emissions. The Amendment shall not increase **SPA-wide** greenhouse gas emissions above an average 5.80 metric tons per capita (including emissions from building energy usage and vehicles.) **If the SPA amendment would require a change in the approved GHG Reduction Plan in order to meet the 5.80 MT $CO_2e$ threshold, then the proponent of the SPA amendment shall consult with the Sacramento County Environmental Coordinator on the revised analysis and shall prepare a revised GHG Reduction Plan for approval by the County who will coordinate with [the district]."** (Revisions in bold.)

15

Environmental Council cites table CC-15, which states that the combined land uses in the Project will emit 5.80 metric tons of greenhouse gas per capita. They argue that the remaining portions of the EIR's climate change analysis indicate that if the university is not built, the Project will increase the per capita greenhouse gas emissions. Therefore, the EIR does not adequately inform the public or decision makers about the environmental impact.

However, mitigation measure CC-1 prohibits amendments to the SPA from increasing greenhouse gas emissions above the 5.80 metric ton per capita amount. If the SPA amendment requires the greenhouse reduction plan to be changed to meet the 5.80 metric ton amount, the County must approve a revised greenhouse reduction plan. Mitigation measure CC-1 requires that a revised use of the land satisfy the 5.80 metric ton threshold and that the County must approve a revised greenhouse gas reduction plan to meet this threshold. The EIR adequately discussed greenhouse gas impacts.

**Traffic**

Environmental Council also faults the EIR's traffic analysis as being inadequate because it is based on the full buildout of the proposed university. Without the university component, Environmental Council argues, the transportation analysis misstates and underestimates the Project's impact because it assumes reductions based on a university which may never occur.

According to Environmental Council, the EIR relies on unrealistically high non-automobile mode share, because 43 percent of the total university trips within the university area will use nonautomotive modes and only 12 percent of the trips in the Project area will use nonautomotive modes. Environmental Council also contends the EIR relies upon an improper trip internalization reduction based on the assumption the university will be built.

Environmental Council raised these same arguments in their comments on the EIR. The final EIR responded to these comments and provided evidence supporting the

16

County's determination of the transportation impacts. The final EIR noted that "as a proportion of overall trips, the large non-automotive share for the university has a very small impact on overall mode-share." In addition, the Environmental Council's comment assumes that a major portion of trip reductions occur because of the university, but those reductions "were based on factors such as the proposed transit system, Neighborhood Electric Vehicle system, pedestrian and bicycle trails, and proximity to uses." They also overlooked that fact that removing the university could result in the reduction of 9,000 daily trips, and therefore there was no basis for the assertion that "removal of the university/college campus center is certain to be a 'worst-case' traffic scenario." Again, Environmental Council has not met its burden of showing the EIR underestimates traffic impacts.

## IV

### *Consistency with Sacramento Area Council of Government's Metropolitan Transportation Plans/Sustainable Communities Strategy*

Environmental Council also challenges the EIR for failing to address whether it was consistent with the Sacramento Area Council of Government's (SACOG) metropolitan transportation plans/sustainable communities strategy (MTP/SCS). According to Environmental Council, inclusion of the Project in future MTP/SCS would require changes to the land use pattern and transportation system from the current MTP/SCS in order to reduce emissions elsewhere in the region to make up for the Project's higher emissions. Senate Bill No. 375 (2007-2008 Reg. Sess.) requires metropolitan planning organizations in California to reduce per capita vehicle miles traveled (VMT) and related greenhouse gasses through a coordinated land use and transportation plan called the sustainable communities strategy (SCS). (Gov. Code, §§ 65080.)

17

County objects to this contention on procedural and substantive grounds. Environmental Council failed to exhaust their administrative remedies by not presenting this argument to the County Board of Supervisors in the administrative process. Moreover, County points out, nothing in Senate Bill No. 375 requires a project be evaluated under CEQA for consistency with an SCS.

We agree.  In failing to raise the issue during the administrative process, Environmental Council has waived the issue.  (*Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839, 864.)  Nor does Environmental Council cite any evidence that a project must be evaluated under CEQA for consistency with an SCS.  Environmental Council does not provide any response to these challenges in their reply brief.

V

*Failure to Adopt Feasible Mitigation Measures*

Finally, Environmental Council contends the record demonstrates a mitigation measure requiring phasing of project development in conjunction with a university would assist in reducing the Project's environmental impacts.  Therefore, the County violated CEQA by failing to adopt feasible mitigation measures to minimize environmental impact.

CEQA requires that an EIR propose and describe mitigation measures to minimize significant environmental effects. (Pub. Resources Code, §§ 21002.1, subd. (a); 21100, subd. (b)(3).)  An agency must adopt feasible mitigation measures when approving a project to reduce or avoid significant environmental effects.  (Pub. Resources Code, §§ 21002, 21081, subd. (a).)

In essence, Environmental Council argues that phasing the project would provide assurance that a university would be constructed.  The trial court interpreted phasing "to mean not building all or part of the Project until a university has been located." According to Environmental Council, as a result of County's failure to adopt phasing "the

18

entire non-university can be fully constructed and developed without any efforts to attract or construct a university." Environmental Council repeats its arguments that greenhouse gas emissions, VMT, and ozone precursors are significantly less with a university and greater if the university is not built.

County addressed mitigation measures in the findings and statement of overriding considerations: "Any of the mitigation measures that were suggested in the [draft EIR] and [final EIR] but not incorporated into the Project due to their infeasibility are infeasible in part because such measures would impose limitations and restrictions on the Project so as to prohibit the attainment of economic, social, and other benefits of the Project which this Board finds outweigh the unmitigated impacts of the Project."

Although Environmental Council asserts that phasing of the Project is feasible, they fail to provide any evidence in the record to support this conclusion. It is not the court's duty to independently review the administrative record to find relevant facts to support Environmental Council's claim of feasibility. Therefore Environmental Council forfeited the argument that phasing was a feasible mitigation measure, and that County's decision not to phase the Project was unsupported by substantial evidence. (*Tracy, supra*, 177 Cal.App.4th at pp. 934-935; *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1028-1029.)

## DISPOSITION

The judgment is affirmed.  The respondents shall recover costs on appeal.  (Cal.
Rules of Court, rule 8.278(a)(1) & (2).)


                                    _____/s/_____
                                    RAYE, P. J.



We concur:



_____/s/_____
BLEASE, J.



_____/s/_____
ROBIE, J.

Filed 3/2/20

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ENVIRONMENTAL COUNCIL OF SACRAMENTO et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF SACRAMENTO et al., <br><br> Defendants and Respondents; <br><br> CORDOVA HILLS, LLC et al. <br><br> Real Parties in Interest and Respondents. | C076888 <br><br> (Super. Ct. No. 34201380001424CUWMGDS) <br><br> ORDER CERTIFYING OPINION FOR PUBLICATION <br><br> [NO CHANGE IN JUDGMENT] |

APPEAL from a judgment of the Superior Court of Sacramento County, Shelleyanne W.L. Chang, Judge. Affirmed.

Law Offices of Donald B. Mooney and Donald B. Mooney for Plaintiffs and Appellants.

John F. Whisenhunt, County Counsel and Krista C. Whitman, Assistant County Counsel, for Defendants and Respondents.

Law Offices of Gregory D. Thatch, Gregory D. Thatch and Larry C. Larsen for Real Parties in Interest and Respondents.

THE COURT:

The opinion in the above-entitled matter filed January 30, 2020, was not certified for publication in the Official Reports. For good cause it appears now that the opinion should be published in the Official Reports and it is so ordered.


BY THE COURT:


_____/s/_____
RAYE, P. J.


_____/s/_____
BLEASE, J.


_____/s/_____
ROBIE, J.